*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-633

11/02/2017

FILED
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

DISTRICT OF COLUMBIA, APPELLANT,

v.

EXXONMOBIL OIL CORPORATION, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-5874-13)

(Hon. Craig Iscoe, Trial Judge)

(Argued November 9, 2016                    Decided November 2, 2017)

*Catherine A. Jackson*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, *Donna M. Murasky*, Senior Assistant Attorney General, and *Bennett Rushkoff*, Assistant Deputy Attorney General, were on the brief, for appellant.

*Robert M. Loeb* for appellee ExxonMobil Oil Corporation. *Ross C. Paolino*, and *Christina G. Sarchio*, were on the brief, for appellee.

*Alphonse M. Alfano* for appellees Anacostia Realty, LLC, Springfield Petroleum Realty, LLC, and Capitol Petroleum Group, LLC.

*William L. Taylor* and *Alan J. Thiemann* were on the brief for Mid-Atlantic Petroleum Distributors Association, Inc., *amicus curiae*, in support of appellees.

Before THOMPSON and EASTERLY, *Associate Judges*, and REID, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Dissenting opinion by *Associate Judge* EASTERLY at page 51.

THOMPSON, *Associate Judge*:    This action arose when appellant District of Columbia ("the District"), asserting that it was acting "in its *parens patriae* capacity and through its Attorney General," brought suit against defendant/appellee ExxonMobil Oil Corp. ("Exxon") and defendants/appellees Anacostia Realty, LLC ("Anacostia") and Springfield Petroleum Realty, LLC ("Springfield") (affiliated entities sometimes hereafter referred to together as the "Distributors"), and Capitol Petroleum Group, LLC ("CPG")[1] for declaratory and injunctive relief for claimed violations of D.C. Code § 36-303.01 (a)(6) and (11) (2012 Repl.), contained in Subchapter III of a statute known as the "Retail Service Station Act" ("RSSA").    The Superior Court granted defendants'/appellees' motions to dismiss the complaint, agreeing with the defendants that the District had not "established standing through common law *parens patriae* authority" and "does not have express or implied statutory authority" to maintain this action.  The District argues that the trial court erred in dismissing the complaint.  We agree and therefore reverse and remand for further proceedings.

---

[1]    Appellees describe CPG as "a service company that does not own or control any service stations and is not engaged in the sale of motor fuels in the District or elsewhere."

# I. Background

## A. The Allegations of the Complaint

The complaint alleges that until 2009, Exxon owned a number of retail gasoline service stations located in the District, which it leased to independent retail dealers that operated the stations under franchise agreements. Under the franchise agreements, Exxon had the exclusive right to supply Exxon-branded gasoline to the retail service stations. Although refiner Exxon also had gasoline distribution agreements with wholesale gasoline distributors in the area, it prohibited them from supplying Exxon-branded gasoline to the franchisee retail service stations. Beginning in 2009, Exxon transferred ownership of its retail service station properties either to Anacostia or Springfield. Exxon also assigned to Anacostia or Springfield its rights under the franchise agreements.

According to the District — and this is the gravamen of its complaint — "[t]he dealer franchise agreements, and later versions of these agreements" unlawfully "compel the independent retail dealers operating these stations to buy their Exxon-branded gasoline exclusively from – and at prices set by" Anacostia or

Springfield or CPG.  The complaint further alleges that Exxon continues to enforce the unlawful exclusive-supply requirement through its distribution agreements with Anacostia and Springfield, which "allow only one supplier to supply [Exxon-branded] gasoline to each Exxon-branded gasoline station in D.C."  As a result of the dealer-franchise and distribution agreements, the complaint alleges, the defendants/appellees "set the wholesale price[] paid for Exxon-branded gasoline in D.C.," depriving retail dealers who sell Exxon-branded gasoline and "many thousands of consumers in D.C." who purchase Exxon-branded gasoline in D.C. of "the benefits of competition in the wholesale supply of Exxon-branded gasoline." The complaint asserts that independent retail Exxon stations cannot "purchase Exxon-branded gasoline at prices below the prices charged by" the Distributors. The complaint further asserts that of the thirty-one Exxon-branded gasoline stations in the District, all of which are owned by Anacostia or Springfield, twenty-seven are operated by independent retail dealer franchisees, all of which are subject to and restricted by the allegedly unlawful dealer-franchise and distribution agreements.  According to the complaint, these independent franchisee-operated retail stations comprise about 25% of the gasoline stations in the District.

The complaint charges that the dealer-franchise agreements between the Distributors and independent retail service stations and the distribution agreements

between Exxon and the Distributors (all of which the District asserts constitute "marketing agreements" as that term is defined in the RSSA) violate two provisions of Subchapter III of the RSSA:  D.C. Code § 36-303.01 (a)(6) and (11). D.C. Code § 36-303.01 (a)(6) states that:

> [No marketing agreement shall . . .] [p]rohibit a retail dealer from purchasing or accepting delivery of, on consignment or otherwise, any motor fuels, petroleum products, automotive products, or other products from any person who is not a party to the marketing agreement or prohibit a retail dealer from selling such motor fuels or products, provided that if the marketing agreement permits the retail dealer to use the distributor's trademark, the marketing agreement may require such motor fuels, petroleum products, and automotive products to be of a reasonably similar quality to those of the distributor, and provided further that the retail dealer shall neither represent such motor fuels or products as having been procured from the distributor nor sell such motor fuels or products under the distributor's trademark[.]

D.C. Code § 36-303.01 (a)(11) states that "no marketing agreement shall" "[c]ontain any term or condition which, directly or indirectly, violates this subchapter."  The complaint asks for a declaration that defendants'/appellees' marketing agreements violate these provisions of District of Columbia law and for an injunction prohibiting enforcement of the agreements.

### B. The Trial Court's Ruling on the Motions to Dismiss

The District filed its complaint on August 27, 2013, and appellees filed their motions to dismiss on October 7, 2013. Asserting that the RSSA sets out "a carefully crafted enforcement scheme in which the Mayor of the District of Columbia is authorized to enforce Subchapters II and IV of the Act"[2] and in which "retail service station dealers are authorized to enforce Subchapter III,"[3] appellees argued first that the statute makes a "clear[] and explicit[] assign[ment of] separate roles," indicating that "no public enforcement of Subchapter III was intended." Accordingly, appellees argued, the Attorney General has no "cause of action" or "right of action" to enforce, and "no role . . . in enforcing," Subchapter III of the RSSA and that the allegations of the complaint otherwise fail to state a claim.

In addition to arguing that the District lacks statutory authority to sue to enforce Subchapter III of the RSSA, appellees argued that the District in its complaint failed to allege the concrete injury necessary to establish Article III-type standing to maintain this suit. Appellees argued that the complaint asserts in only a

---

[2] *See* D.C. Code § 36-302.05 (a) (2012 Repl.).

[3] *See* D.C. Code § 36-303.06 (a)(1) (2012 Repl.).

"vague and undefined way" that Exxon's and the Distributors' conduct deprives dealers and consumers of the benefits of competition. They contended in addition that the District failed to assert a "quasi-sovereign interest" — "a harm that is sufficiently severe and generalized as to threaten the economy of the District as a whole" — to support its assertion that it is suing as *parens patriae*.

After a hearing on January 9, 2014, the Superior Court issued its May 6, 2014, Order dismissing the complaint. The court began its analysis by noting that "the RSSA does [not] provide an express statutory right for the Attorney General or Mayor to pursue violations of Subchapter III." The court cited the provision of the RSSA that expressly gives the Mayor authority to enforce Subchapters II and IV of the statute (D.C. Code § 36-302.05 (a)) and the provision that "expressly allows for a retail dealer to file a civil action against distributors [in certain circumstances]" (D.C. Code § 36-303.06 (a)(1)) and reasoned that the "failure to give the Mayor authority to enforce violations of Subchapter III [was] not a mere oversight." The court further reasoned that because the RSSA contains no language making its provisions enforceable by "'any person' injured or aggrieved," the statute also does not confer on the District implied authority to enforce Subchapter III.

The court rejected the District's argument that the broad authority to uphold the public interest vested in the Attorney General under D.C. Code § 1-301.81 (2012 Repl.) permits the Attorney General to sue to enforce the RSSA. Looking to the then-most-recent legislative history of the RSSA, the court reasoned that the Council of the District of Columbia (the "Council") "deliberately" and "consciously chose not to [amend the RSSA so as to] grant the Attorney General or Mayor the express ability to enforce penalties for violations of Subchapter III of the RSSA." The court's statement was a reference to Bill 19-299, proposed by the Attorney General and introduced in 2011, that would have given the Attorney General pre-complaint investigatory subpoena authority with respect to suspected violations of D.C. Code § 36-303.01 (a)(6) by any refiner or dealer, as well as express authority to sue to enjoin any such violations and to recover civil penalties, attorneys' fees, and costs.

Moving to the issue of standing, the court reasoned that the District's allegations were not "sufficiently concrete as to create an actual controversy between the District and Defendants" given that the allegations did not cite "specific effects of the unlawful marketing agreements, which affect the economy of the District." In particular, the court reasoned, the complaint fell short because it fails to allege "that the price of ExxonMobil's fuel is too high at service

stations"; that there is a "dealer who would want to purchase motor fuel from a third-party supplier"; that "there exists a third-party supplier, which would sign contracts with retail dealers for lower prices"; that "retail dealers desire such competition";[4] or "that if a retail dealer were to purchase gasoline from a third-party supplier, then that relationship would create or ensure lower prices for consumers." The court also remarked that the District's allegation that none of the twenty-seven independent retail dealers can purchase Exxon-branded gasoline at prices below the prices charged by the Distributors was "conclusory and unsupported by any factual allegations."

Citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ("*Snapp*"), the court rejected the District's argument that it has standing to sue through its *parens patriae* authority, reasoning that the complaint fails to "allege a quasi-sovereign interest." The court explained that a state asserts "a quasi-sovereign interest in the health and well-being of its citizens [only] when the articulated injury is sufficiently concrete and affects a substantial segment of its

---

[4] Referring to the District's argument at the hearing on the motions to dismiss that "it was . . . aware of retail dealers who wanted to seek other suppliers or distributors who would sell gasoline for a lower price," the court remarked that "these allegations are not in the Complaint."

population."[5]  The court remarked that the District "is essentially alleging an abstract and hypothetical injury."  The court observed in addition that the District was "requesting purely injunctive relief"[6] but had "not alleged any specific future harm" "other than generally alleging that the marketing agreements damage the competitive effects of the gasoline markets."

Reiterating that the "Council thus far has chosen not to provide the Attorney General with authority to bring actions under Subchapter III," the court ruled that "[u]ntil such time as the Council changes its position, . . . the Attorney General has no standing to bring actions under that Subchapter of III of the RSSA" and that the Council "clearly intended for only retail dealers to have a right of action pursuant

---

[5]  As appellees emphasize, the Supreme Court stated in *Snapp* that for a State to maintain a *parens patriae* suit based on a quasi-sovereign interest, the State must "allege[] injury to a sufficiently substantial segment of its population." 458 U.S. at 607.  Typically, the matters complained of must be of "grave public concern," "affect [the State's] citizens at large," and "seriously jeopardize[]" their physical or economic well-being, such that the State "has an interest apart from that of the individuals affected."  *Id.* at 602-03, 605-07 (internal quotation marks omitted).

[6]  In fact, the District's complaint also seeks declaratory relief as well as (the boilerplate) "such further equitable relief as the [c]ourt deems just and proper."

to Subchapter III."[7]  Accordingly, the court dismissed the complaint.  This appeal

by the District of Columbia followed.

## II.  Standard of Review

The trial court did not couch its rulings in terms of Rule 12 (b)(1) or Rule 12

(b)(6) of the Superior Court Rules of Civil Procedure, but we treat its ruling that

the District lacks concrete-injury-in-fact standing as a ruling under Super. Ct. Civ.

R. 12 (b)(1) and its ruling that only retailer dealers may sue to enforce Subchapter

---

[7] The court did not reach the argument by defendants/appellees Anacostia, Springfield, and CPG that the District's complaint fails to state a claim that they have violated § 36-303.0l (a)(6).  The court explained that "[b]ecause of its ruling on standing and because the parties did not fully brief the exclusivity issue or address it at oral argument," it would not reach a determination on "whether the plain language of the 'exclusivity' provision of the RSSA prohibits a retail dealer from purchasing motor fuels from a distributor who supplies the same-branded motor fuels as the distributor with whom it has a marketing agreement."

Assuming *arguendo* that the District did have standing, the trial court found that Exxon, no less than the Distributors, "would also be liable for any violation of the RSSA because a [']marketing agreement['] also [comprises] collateral and ancillary agreements" such as the agreements between Exxon and the Distributors that allegedly require exclusive-dealing restrictions.  Exxon, whose brief in this court adopts by reference the arguments of the other appellees, has not challenged that conclusion.

III of the RSSA as a ruling under Super. Ct. Civ. R. 12 (b)(6).[8] Standing (and whether to uphold a dismissal under Super. Ct. Civ. R. 12 (b)(1) for lack of standing) is a question of law which this court considers on appeal *de novo*. *See UMC*, 120 A.3d at 42. Our review of a dismissal under Super. Ct Civ. R. 12 (b)(6) for failure to state a claim is also *de novo*. *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 730 (D.C. 2011). "[T]he dispute between the parties in this case requires us to decide the proper interpretation of a statute, a question of law," and our review of that issue, too, is *de novo*. *Medstar Health, Inc. v. District of Columbia Dep't of Health*, 146 A.3d 360, 368 (D.C. 2016).

## III.    Analysis

## A.  Whether the District Has Standing to Maintain This Suit

The trial court began its analysis by addressing the issue of whether the Attorney General has statutory authority to maintain this suit. For reasons we shall

---

[8] *See UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015) ("[A] plaintiff's standing is properly raised as a challenge to the court's subject matter jurisdiction via a motion to dismiss under Super. Ct. Civ. R. 12 (b)(1)[.]"); *Grayson v. AT&T Corp.*, 15 A.3d 219, 224 (D.C. 2011) (en banc) ("[W]e consider whether [the] complaint states a cause of action within the meaning of [Super. Ct. Civ. R. 12 (b)(6)]."); *see also Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.24 (5th Cir. 2011) ("Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6).").

explain, that is the primary question presented by this appeal, but we begin instead with the "threshold jurisdictional question" of standing. *Grayson*, 15 A.3d at 229.

"[E]ven though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III." *Id.* at 224. "[T]he irreducible constitutional minimum of standing consists of three elements[:] The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and citation omitted); *see also Grayson*, 15 A.3d at 234 n.36 (explaining that the injury-in-fact requirement requires "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical" (internal quotation marks and citations omitted)).

We also apply prudential standing rules, i.e., "judicially self-imposed limits on the exercise . . . of jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights." *Id.* at 235 (internal quotation marks omitted); *Padou v. District of Columbia Alcoholic Bev. Control Bd.*, 70 A.3d 208,

211 (D.C. 2013) ("[U]nder the so called prudential principles of standing, a plaintiff may only assert its legal rights, [and] may not attempt to litigate generalized grievances." (internal quotation marks omitted)).  The Supreme Court established in *Warth v. Seldin*, 422 U.S. 490 (1975), that the legislature may "either expressly or by clear implication" "grant a[] . . . right of action to persons who otherwise would be barred by prudential standing rules."  *See id.* at 501 ("[P]ersons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim."); *see also, e.g.*, *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008) ("[S]tate law may create the asserted legal interest.").  To the extent this case raises a prudential standing issue, that issue is subsumed in our discussion in section III.B below.[9]

### 1.  The District Was Not Required to Assert Injury to a Quasi-Sovereign Interest to Establish Standing to Sue As *Parens Patriae*.

---

[9]  There, we discuss the power that District law confers on the Attorney General of the District of Columbia to pursue the public interest and whether the Attorney General has a cause of action to enforce Subchapter III of the RSSA.  *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) ("[C]ause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court[.]").

In their motions to dismiss and their arguments to the trial court, appellees framed the issue of standing in this case as an issue of whether the District had asserted an interest "sufficiently concrete [and particularized] to create an actual controversy between the state and the defendant for Article III purposes." Appellees argued that to do this, the District's complaint had to "establish an injury to a quasi-sovereign interest," "the most basic and most fundamental requirement[]" for parens patriae standing." Citing *Snapp*, they told the court that, to establish that it was acting in pursuit of a quasi-sovereign interest, the District was required to allege "enough citizens injured," i.e., "injury to a substantial segment of the population," sufficient "to either damage the economy or threaten an injury to the economy." The District's opposition brief and the trial court's Order largely followed that lead, and the briefs on appeal likewise focus a great deal of attention on whether the District's complaint alleged concrete injury to a substantial enough segment of the District's population, such that the District was asserting a quasi-sovereign interest and has standing on that basis.

Importantly, however, the context of the Supreme Court's statements in *Snapp* on which the parties and the trial court have relied was its "articulat[ion of] the circumstances under which a state has *parens patriae* standing to bring an

action [in federal court] under *federal* law."[10]  *Massachusetts v. Bull HN Info. Sys.*, 16 F. Supp. 2d 90, 96 (D. Mass. 1998) (emphasis added); *see also Sierra Club v. Two Elk Generation Partners, Ltd.*, 646 F.3d 1258, 1275 (10th Cir. 2011) ("[T]he parens patriae doctrine . . . is a doctrine of standing which affords state officials a platform from which to vindicate their quasi-sovereign interests in federal court.").[11]  The *Snapp* Court did not purport to establish the requirements for

---

[10]  The Court has required a State seeking to sue another State in the Supreme Court in an effort to redress alleged harms to the plaintiff State's citizens (and invoking the Court's original jurisdiction under Art. III, § 2, of the U.S. Constitution) to assert an interest that rises to the level of a quasi-sovereign interest because "if, by the simple expedient of bringing an action in the name of a State, this Court's original jurisdiction could be invoked to resolve what are, after all, suits to redress private grievances, our docket would be inundated." *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (denying Pennsylvania's motion for leave to file suit as *parens patriae* on behalf of its citizens because the suit "represents nothing more than a collectivity of private suits against New Jersey for taxes withheld from private parties," *id.* at 665-66).

[11]  *See also* Dwight R. Carswell, Comment, *CAFA and Parens Patriae Actions*, 78 U. CHI. L. REV. 345, 347 (2011) ("[T]he *parens patriae* standing doctrine allows a state to bring an action on behalf of its citizens *under a federal statute* whenever the state can demonstrate a quasi-sovereign interest.") (emphasis added).  Indeed, "[t]he primary justification for recognizing *parens patriae* standing in the States . . . [is that] the States have surrendered certain aspects of their sovereignty to the federal government and, in return, are given recourse [to the federal courts] to solve their problems with other States," *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 337 (1st Cir. 2000); to "secur[e] observance of the terms under which [the States] participate[] in the federal system," *Snapp*, 458 U.S. at 607-08; and to "assur[e] that the benefits of the federal system are not denied to [the] general population" of each State, *id.* at 608.

bringing a *parens patriae* suit where a State (or, as here, the District) brings suit in its local court to enforce its own laws.

Moreover, as we discussed with the parties at oral argument, in *Snapp*, the Supreme Court distinguished a quasi-sovereign interest, which "consist[s] of a set of interests that the State has in the well-being of its populace," 458 U.S. at 602, from a *sovereign* interest. The Court explained that one "easily identified" "sovereign interest[]" is "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code, both civil and criminal." 458 U.S. at 601. *See also Louisiana ex rel. Ieyoub v. Brunswick Bowling & Billiards Corp.*, No. 95-404, 1995 U.S. Dist. LEXIS 3506, at *4-6 (E.D. La. Mar. 20, 1995) (stating, in remanding to state court an action initially brought there by the Louisiana Attorney General to remedy violations of state unfair trade laws but erroneously removed by the defendant to federal court, that "[t]he parties . . . discuss at length *parens patriae* standing and whether the State has a supporting 'quasi-sovereign' interest in this matter. But, the State's interest here, if any, is not quasi-sovereign, but sovereign. The State has a sovereign interest in 'the exercise of sovereign power,'" which includes "'the power to create and enforce a legal code, both civil and criminal'" (quoting *Snapp*, 458 U.S. at 601)).

Further, the Supreme Court has instructed that a "State has standing to sue . . . when [either] its sovereign [interests] or [its] quasi-sovereign interests are implicated." *Pennsylvania v. New Jersey*, 426 U.S. at 665 (discussing suits under the Court's original jurisdiction). In addition, while the Court confirmed in *Snapp* that "a *parens patriae* action c[an] rest upon the articulation of a 'quasi-sovereign' interest," *Snapp*, 458 U.S. at 602 (citing *Louisiana v. Texas*, 176 U.S. 1 (1900)), the Court has instructed as well that "when a State is 'a party to a suit involving a matter of sovereign interest,' it is *parens patriae* and 'must be deemed to represent all of its citizens.'" *South Carolina v. North Carolina*, 558 U.S. 256, 266 (2010) (brackets omitted) (quoting *New Jersey v. New York*, 345 U.S. 369, 372-73 (1953)).

Thus, under the cases discussed above, a State's standing to sue as *parens patriae* may be based on its assertion of a sovereign interest (such as when it sues to "enforce [its] legal code," *Snapp*, 458 U.S. at 601) rather than on its assertion of a quasi-sovereign interest. The implication for this case is that appellees were not entitled to prevail on their claim that the District lacks *parens patriae* standing to

maintain this action merely by satisfying the trial court that the District had not established a quasi-sovereign interest.[12]

We recognize that even after enactment of the District's Home Rule charter, the District is merely "akin to a sovereign State."[13] *Feaster v. Vance*, 832 A.2d

---

[12] Our conclusion that the District did not need to show a quasi-sovereign interest under *Snapp* should not be read to imply that the District's interest in fostering a competitive gasoline market for the benefit of consumers would not qualify as a quasi-sovereign interest if that were the applicable test. While "increased legal protection to retail dealers" was "one of the Council's objectives in adopting the RSSA," *Dege v. Milford*, 574 A.2d 288, 291 (D.C. 1990) (internal quotations marks omitted), the Council also found that non-competitive practices, including "functional exclusive dealing arrangements," "will continue to have severe detrimental impacts on consumers in the District of Columbia" and that the new legislation would "enhance competition" to the benefit of consumers. D.C. Council, Comm. on Transp. & Envtl. Affairs, Report on Bill No. 1-333 at 19, 22 (Sept. 10, 1976) (the "1976 Report"); *cf. Kelley v. Carr*, 442 F. Supp. 346, 356 (W.D. Mich. 1977) ("Surely some of the most basic of a state's quasi-sovereign interests include maintenance of the integrity of markets and exchanges operating within its boundaries[.]"). The District's complaint alleges "widespread" violations of the provision of the RSSA that prohibits exclusive dealing arrangements. And though we need not decide the issue, we are inclined to agree with the trial court that the District's allegations about "27 retail dealers" and "thousands of consumers" "may represent a substantial segment of the District's population."

[13] At oral argument, the Assistant Attorney General acknowledged this, saying that "the District has an interest akin to a sovereign interest" albeit not "in the same way as a state has a sovereign interest in our system." She added that "[t]he District obviously does have an interest in enforcing its laws and in protecting its public" and has "sovereign authority . . . delegated through . . .the Home Rule Act."

1277, 1287 (D.C. 2003); *see also District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 105-08 (1953) ("The subordinate legislative powers of a municipal character, which have been or may be lodged in the city corporations, or in the District corporation, do not make those bodies sovereign." (internal quotation marks omitted)); *District of Columbia v. Owens-Corning Fiberglas Corp.*, 572 A.2d 394, 404 n.26 (D.C. 1989) ("[U]nder the Home Rule Act, the District government continues to exist as a body corporate for municipal purposes[.]" (internal quotation marks omitted)).  However, this court has recognized that the District, which has "the burden of legislating upon essentially local District matters," D.C. Code § 1-201.02 (a) (2012 Repl.), is a sovereign for many purposes. *See, e.g.*, *Feaster*, 832 A.2d at 1287 ("The District of Columbia government is thus both the *de jure* and the *de facto* sovereign with respect to local public employee labor relations in the District."); *Barnhardt v. District of Columbia*, 8 A.3d 1206, 1214 (D.C. 2010) (referring to the District of Columbia's "sovereign immunity"). Here, there is "no need for us to decide that the District has all the sovereignty of a state," *Owens-Corning*, 572 A.2d at 403, to conclude, as we do, that this case is a suit by the District based on its sovereign interest in enforcing statutory prohibitions its legislature has enacted as part of "the public policy of the District of Columbia."[14]  D.C. Code § 36-305.01 (2012 Repl.).

---

[14]  At oral argument, when asked whether the District had in effect asserted a

(continued…)

Our dissenting colleague criticizes that conclusion on the ground that the District never advanced a sovereign-interest theory of standing. To be sure, the District did focus its briefing, before us and in the trial court, on whether its complaint sufficiently pled a quasi-sovereign interest, but the District has not entirely overlooked what the Supreme Court said in *Snapp* about *parens patriae* standing and sovereign lawmaking power: The Court explained that "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." 458 U.S. at 607. Relying on that statement in *Snapp*, the District argued in its brief to us that "[t]he fact that the District not only could address, but *has* addressed, the threat of injury to its wholesale gasoline market through legislation . . . confirms that the alleged injury suffices to provide

---

(…continued)

sovereign interest, counsel for the Distributors did not squarely disagree with that characterization, but pressed the following point: "They still have to have statutory authority to bring the lawsuit. You can't just assert a sovereign interest. . . . I've never seen in any case whether you're asserting a sovereign interest, a proprietary interest, a quasi-sovereign interest, where if you're suing under a statute you don't need some sort of authority that you can simply ignore the will of the legislature." We address in section II.B *infra* whether permitting this suit to proceed would "ignore the will of the legislature."

the District with [the] *parens patriae* standing" it asserted in its complaint.[15] The District made a similar argument in its brief opposing appellees' motion to dismiss, arguing that "the appropriateness of the District seeking relief as *parens patriae* is strengthened by the RSSA's explicit recognition of the public interest in enhancing honest competition in D.C.'s gasoline supply."[16] That argument by the District accords with the Supreme Court's statement, quoted *supra*, that "when a State is a party to a suit involving a matter of sovereign interest, it is *parens patriae* and must be deemed to represent all of its citizens." *South Carolina v. North Carolina*, 558 U.S. at 266 (brackets and internal quotation marks omitted).

---

[15] Neither this argument by the District nor our acceptance of it can fairly be read to say that the District may sue as *parens patriae* to enforce *every* District of Columbia law. As has been observed, "[a] statute declaring conduct 'unlawful' [or establishing a prohibition against certain conduct] is of a different order of magnitude with respect to public policy than a statute which determines the right of one person to recover from another, or sets the jurisdictional requirements for divorce, or governs the custody of a child, or enables a local authority to grant a license." *Shell Oil Co. v. Noel*, 608 F.2d 208, 212 (1st Cir. 1979). The District argues that it is "denied *parens patriae* authority to enforce a statutory provision where "the provision in question is subject to a carefully-crafted enforcement scheme or (2) the District seeks damages without clear legislative intent that it is allowed to do so." We need not decide in this opinion all of the parameters of the District's standing to enforce its body of laws. But we think it clear that the RSSA provisions in issue here state statutory *prohibitions* imposed to foster competition for the benefit of consumers; they are not, as our dissenting colleague suggests, mere "modifi[cations of] common law contract rules." *Post*, at 52.

[16] Thus, contrary to the charge by our dissenting colleague, we have not "raise[d] a new theory of standing for [the District] sua sponte." *Post*, at 64.

In short, the District did not need to allege (in addition) a "quasi-sovereign interest" within the meaning of *Snapp* and its progeny in order to sue in the Superior Court as *parens patriae* to enforce District of Columbia law.[17] The trial court erred in dismissing the complaint for what the court found was its failure to establish *parens patriae* standing by alleging facts necessary to show a quasi-sovereign interest under *Snapp*.

## 2. The District Sufficiently Alleged Standing By Asserting That It Was Suing to Enforce Certain D.C. Statutory Prohibitions, Which Defendants (Allegedly) Are Violating Through Their Marketing Agreements.

In addition to arguing that the District failed to allege facts sufficient to show injury to a substantial segment of its population and thus injury to a quasi-

---

[17] Another reason why the District's assertion of "*parens patriae*" status did not need to be based on an assertion of a quasi-sovereign interest within the parameters established in *Snapp* is that this court has recognized, in a number of contexts, that the Attorney General may — outside those parameters — bring suit in the name of the District of Columbia as *parens patriae* to pursue matters arising under local law. For example, this court has recognized the power of the Attorney General "to sue in a *parens patriae* capacity to enforce the public right to continuing application of charitable trust property to proper purposes," *Hooker v. Edes Home*, 579 A.2d 608, 612, 612 n.9 (D.C. 1990), even though "the District of Columbia does not have a statute specifically authorizing" such actions. *In re Ingersoll Trust*, 950 A.2d 672, 675 n.1 (D.C. 2008) (internal quotation marks omitted). We cite these cases merely to underscore the point that the statement in the District's complaint that it was bringing suit in its *parens patriae* capacity need not be read as an invocation of the quasi-sovereign interest/*parens patriae* doctrine discussed in *Snapp*.

sovereign interest, appellees advance a more general argument that the District failed to establish Article III-type standing. Appellees assert that the District's complaint "alleges no real and concrete injury to any citizen of the District" and, more specifically, no injury to competition, retail dealers, suppliers, or consumers.

However, to repeat, the District's complaint alleges and seeks to enjoin violations of *District of Columbia* law, specifically, violations of certain marketing-agreement prohibitions set out in the RSSA ("No marketing agreement shall . . . ."). Case law establishes that a government is injured when its laws are violated. *See, e.g.*, *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("It is beyond doubt that the complaint asserts an injury to the United States[,]" i.e., an "injury to its sovereignty arising from violation of its laws.").[18] The District's argument in its brief to this court that it

---

[18] *See also United States v. Yarbrough*, 452 F. App'x 186, 189 (3d Cir. 2011) ("Because the Government has standing to enforce its own laws, [appellant's] argument that the Government has failed to allege an injury in fact is frivolous."); *Stauffer v. Brooks Bros.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) ("Congress has, by enacting [a statute that prohibits falsely marking an unpatented item with the word "patent"], defined an injury in fact to the United States. In other words, a violation of that statute inherently constitutes an injury to the United States. . . . The parties have not cited any case in which the government has been denied standing to enforce its own law. Because the government would have standing to enforce its own law, Stauffer, as the government's assignee, also has standing[.]"); *id.* at 1327 (stating that "the United States' sovereign injury is sufficient to confer standing upon it" and finding it unnecessary to decide whether

(continued…)

satisfied Article III standing requirements because "[g]overnmental entities have a

_____

(…continued)

a proprietary or a sovereign injury of the United States was implicated in the qui tam action because "either one would confer standing on the government, and therefore Stauffer"); *United States v. Daniels*, 48 F. App'x 409, 418 (3d Cir. 2002) (rejecting as frivolous criminal defendant's contention that his crimes did not inflict the concrete and imminent injury in fact on the United States that Article III requires, because "[a]s sovereign, the United States has standing to prosecute violations of valid criminal statutes"); *Crockett v. District of Columbia*, 95 A.3d 601, 605 (D.C. 2014) (reasoning that because "[t]he Attorney General for the District of Columbia is responsible for all law business of the . . . District and for upholding the public interest" . . . [and] is also authorized to intervene in legal proceedings on behalf of this public interest[,] . . . the Attorney General has an interest, sufficient to confer standing, in the enforcement of the criminal laws of the District of Columbia" (internal quotation marks and citation omitted)); *EEOC v. Day & Zimmermann NPS, Inc.*, No. 15-cv-1416 (VAB), 2017 U.S. Dist. LEXIS 133918, at *21-22 (D. Conn. Aug. 22, 2017) ("[W]here Congress enacts a statute that 'define[s] an injury in fact to the United States,' and the statute shows that 'Congress [has] determined that such conduct is harmful and should be prohibited,' then 'a violation of that statute inherently constitutes an injury to the United States.'" (quoting *Stauffer*, 619 F.3d at 1325); *Newt LLC v. Nestle USA Inc.*, No. 09-C-4792, 2011 U.S. Dist. LEXIS 32837, at *5 (N.D. Ill. Mar. 28, 2011) ("The government always has standing to enforce its own laws[.]"); *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-cv-168-wmc, 2011 U.S. Dist. LEXIS 55011, at *10-11 (W.D. Wis. Mar. 15, 2011) ("[I]t is unlikely the government has ever been denied standing to enforce its own laws."); *cf. In re Debs*, 158 U.S. 564, 584 (1895) ("Every government, entrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."); *Castillo v. Cameron County*, 238 F.3d 339, 351 (5th Cir. 2001) ("Because the State has a sovereign interest in enforcing its laws, it has a personal stake in appealing [an] injunction that g[ave] the County discretion to violate those laws.").

concrete stake in the proper application of the laws of their jurisdiction, giving them a sufficient basis for Article III standing in *parens patriae* cases,"[19] is consistent with that case law. (This is an argument the District undeniably advanced, though, as our dissenting colleague emphasizes, it was overshadowed by the District's effort to show that it sufficiently asserted a quasi-sovereign interest as articulated in *Snapp*.) Here, as in *Stauffer*, the parties have not cited — and our own research has not uncovered — "any case in which the government has been denied standing to enforce its own law."[20] 619 F.3d at 1325. Indeed, when a jurisdiction seeks to enforce its own laws, courts have treated the question of standing as subsumed under the question of whether the entity or agency suing has statutory enforcement authority[21] — a matter that the Superior Court recognized as the primary question before it, and which we address *infra*.

---

[19] District's Brief at 13 n.2 (quoting *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1126 (9th Cir. 2006)).

[20] This is not surprising; after all, the whole point of the constitutional standing analysis is "[t]o ensure the proper adversarial presentation," *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007), and "assure[] the court that the issues before it will be concrete and sharply presented." *Sec'y of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984).

[21] *See, e.g.*, *Bhd. of Ry. & S.S. Clerks v. Florida E. Coast Ry. Co.*, 384 U.S. 238, 242 n.4 (1966) ("We have no doubt that the United States had standing to bring this action [alleging that defendant railroad company violated the Railway Labor Act by unilaterally promulgating a new labor agreement]" because statute "ma[d]e[] it the duty of the United States attorney to 'institute in the proper court

(continued…)

Our dissenting colleague faults us for looking to the District's complaint and not stopping with rejection of the District's quasi-sovereign-interest theory of standing. But, "'[f]or purposes [of our review of the Superior Court's] ruling on a motion to dismiss for want of standing,'" we, like the trial court, "'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Grayson*, 15 A.3d at 232 (quoting *Warth*, 422 U.S. at 501); *see also id.* at 247-48 (analyzing whether Grayson had standing by reviewing his allegations in the various paragraphs of his complaint). The District's complaint alleges on its face that appellees have in place marketing agreements that violate District of Columbia law, specifically, prohibitions set out

---

(…continued)

and to prosecute . . . *all necessary proceedings* for the enforcement' of [the section of the Act the company was] charged with violating." (emphasis added) (quoting 45 U.S.C. § 152 Tenth (1964 ed.)); *EEOC v. Celadon Trucking Servs.*, No. 1:12-cv-00275-SEB-TAB, 2015 U.S. Dist. LEXIS 84639, *31-33 (S.D. Ind. June 30, 2015) (holding that "the EEOC . . . suffers an 'injury' sufficient to give rise to Article III standing when a violation of Section 102 of the [Americans with Disabilities Act ("ADA")] occurs," even if "it cannot demonstrate that any of the class members [on whose behalf it sued] suffered an 'injury-in-fact' as a result of the allegedly unlawful inquiries and examinations" and stating that the agency's "standing to bring a suit challenging a violation of the ADA . . . stems directly from . . . the EEOC's own statutory enforcement authority.").

in the RSSA. Those allegations by the District were sufficient to satisfy the injury-in-fact element of Article III-type standing on the District. [22]

---

[22] Our dissenting colleague suggests that a statement by the Supreme Court in *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888) — that a government's "right . . . to institute . . . a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief," *id.* at 285 — compels the conclusion that the District did not carry its burden to establish standing to sue. *Post*, at 56. But, later that same year, the Supreme Court clarified that *San Jacinto* established that "the instrumentality of the court cannot . . . be used . . . where the United States has no pecuniary interest in the remedy sought, and is also under no obligation to the party who will be benefited to sustain an action for his use, *and also where it does not appear that any obligation existed on the part of the United States to the public* or to any individual." *United States v. Am. Bell Tel. Co.*, 128 U.S. 315, 367 (1888) (emphasis added). The Court further clarified that the United States's standing to sue can be based on "its obligation to protect the public from the monopoly of [a] patent which was procured by fraud." *Id.*; *see also id.* at 368 (holding for that reason that the suit against American Bell to cancel fraudulent patents was "not excluded from the jurisdiction of the court by want of interest in the government of the United States").

Whether appellees' marketing agreements actually cause the type of concrete injury the trial court believed must be alleged to establish standing will be a relevant consideration if the District succeeds on its claim that the agreements violate § 36-303.01 (a) and the court goes on to consider whether to issue a permanent injunction enjoining implementation of the offending terms of the agreements. *See Ifill v. District of Columbia*, 665 A.2d 185, 188 (D.C. 1995) (explaining that a permanent injunction requires the trial court to find that the balance of equities favors the moving party, meaning that the court "'must look at the interests of the parties who might be affected by the injunction and must also examine whether the facts and the relevant law indicate that an injunction clearly should be granted or denied apart from any countervailing interest'" (brackets omitted) (quoting *Universal Shipping Co. v. United States*, 652 F. Supp. 668, 675-76 (D.D.C. 1987))). In determining whether to grant injunctive relief, the court would have discretion to consider, for example, whether, as a result of the offending marketing-agreement provisions, "the price of ExxonMobil's fuel is too

(continued…)

Appellees suggested at oral argument that an additional reason why the District's complaint on its face does not establish Article III-type standing is that the RSSA already provides that marketing agreements that violate § 36-303.01 are unenforceable. Therefore, appellees implied, the court can provide no additional redress. We reject this argument. To be sure, to have Article III-type standing, a plaintiff must assert an injury "that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. Here, the parties vigorously disagree about whether § 36-303.01 (a)(6), correctly interpreted, actually prohibits the marketing-agreement provisions the District claims are unlawful: appellees contend, and the District disputes, that the second proviso of § 36-303.01 (a)(6) ("provided further

---

(…continued)

high at service stations." The court would also have discretion to consider the various arguments appellees advanced during the hearing before the trial court (e.g., that if independent dealers move to purchase Exxon-branded gasoline from third party-suppliers of Exxon-branded gasoline, the Distributors will raise the rent on the independent dealers' leased premises, putting the dealers in no better position than they were in before; and that, "wors[t] case," the Distributors, seeking to avoid losses, will "sell the gas station [properties] for [their] highest and best use," selling them for condominium development and putting the dealers out of business). The court may also consider the arguments advanced by *amicus* Mid-Atlantic Petroleum Distributors Association, Inc. (e.g., that dealers "desire" exclusive dealing arrangements in order "to obtain [distributors'] needed investments in their stations" and that injunctive relief "could have an unintended and unconscionably destructive effect upon [dealers'] business . . . in the District of Columbia for years to come," including by disrupting benefits dealers derive from current arrangements for the processing of debit and credit card transactions).

that the retail dealer shall neither represent such motor fuels or products as having been procured from the distributor nor sell such motor fuels or products under the distributor's trademark") permits them to require the franchisee retail service stations to purchase all their Exxon-branded gasoline from Anacostia or Springfield. The dispute is a live one — appellees themselves acknowledge that this case represents a continued effort by the Attorney General to address alleged injury to competition in the gasoline market in the District — and the declaratory relief the District seeks would resolve the dispute. Thus, contrary to appellees' argument, a ruling by the court on this issue would not be a mere advisory opinion about the lawfulness of possible future circumstances. Similarly, the injunctive relief the District seeks would not merely preclude appellees from enforcing the challenged marketing agreements in the courts, but presumably could require affirmative rewriting of the marketing agreements and perhaps restructuring of the parties' relationships.

For the foregoing reasons, we conclude that the Superior Court erred in dismissing the complaint for lack of standing.[23]

---

[23] Appellees contend that, far from prohibiting the specific marketing-agreement terms the District alleges are unlawful, § 36-303.01 (a)(6) "explicitly prohibits retail dealers from selling motor fuels purchased from third-parties under the . . . Exxon trademark." We need not address this argument because a claimed

(continued…)

### B. Whether the District, Through Its Attorney General, Has Authority to Sue to Enforce Marketing Agreement Prohibitions Set Out in the RSSA

We next address whether the District, through its Attorney General, has authority under District of Columbia law to seek judicial relief for (alleged) violations of D.C. Code § 36-303.01 (a)(6) and (11). Our analysis focuses on whether the Council expressly or by clear implication has authorized the Attorney General to maintain an action such as this to enforce D.C. Code § 36-303.01 (a)(6) and (11) (or whether instead the language and legislative history of the RSSA by implication preclude the Attorney General from maintaining this action).

---

(…continued)
"defect in the merits of a party's claim is not the basis upon which to determine standing." *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006) (noting also that "'no court in the modern era has treated a garden-variety substantive defect in [a party's] claim as defeating redressability.'" (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996))); *see also Grayson*, 15 A.3d at 249-52, 249 n.97 (explaining that plaintiff Grayson, who "allege[d] . . . injury in fact[] based on the defendants' violation of his statutory right [under D.C. Code § 28-3904 (2003)] to the disclosure of information," had standing "to require the court to consider whether he is correct that the [statute] endows a consumer with a right to such information," "even if the court would answer [that question] in the negative"; ultimately holding, however, that Grayson's complaint failed to "allege[] the elements of viable claims" under § 28-3904 and that his complaint was therefore "legally insufficient to withstand a Super. Ct. Civ. R. 12 (b)(6) motion").

Appellees argue, and the trial court ruled, that the RSSA must be interpreted as affording retail service stations an exclusive right to enforce the RSSA marketing-agreement provisions involved in this suit. Appellees asserted in the trial court that "[n]o statutory authority exists for the Mayor, the District, or the Attorney General to enforce any provision of Subchapter III of the RSSA." There are several reasons why we reject these arguments and the trial court's conclusion.

**1. The Statutory Authority of the District's Independent Attorney General**

We begin by describing the general statutory authority of the Attorney General and contrasting that authority to the authority formerly conferred on the District's chief legal officer. Prior to 2010, the "conduct of all law business of the . . . District" was the responsibility of a chief legal officer — originally called the "Corporation Counsel" but renamed the "Attorney General" in 2004 pursuant to a Mayor's Order[24] — who was "under the direction of the Mayor." *E.g.*, D.C.

---

[24] *See* Mayor's Order No. 2004-92, 51 D.C. Reg. 6052 (June 11, 2004) (providing also that "[a]ll references in statutes, regulations, rules, and orders to the 'Office of the Corporation Counsel,' the 'Corporation Counsel,' and 'Assistant Corporation Counsels' shall henceforth refer, respectively, to the Office of the Attorney General for the District of Columbia, the Attorney General for the District of Columbia, and Assistant Attorneys General for the District of Columbia").

Code § 1-301.111 (2009);[25] D.C. Code § 1-361 (2000); D.C. Code § 1-301 (1973).

In 2010, the Council passed D.C. Law 18-160, reforming the power of the

Attorney General for the District of Columbia.[26]  As of the effective date of the

---

[25]  Section 1-301.111 provided:

> The Corporation Counsel [now the Attorney General for the District of Columbia] shall be under the direction of the Mayor, and have charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof.  He shall furnish opinions in writing to the Mayor, whenever requested to do so.  All requests for opinions shall be transmitted through the Mayor, and a record thereof kept, with the opinions, in the Office of the Executive Secretary of the Mayor.  He shall perform such other professional duties as may be required of him by the Mayor.

Sections 1-361 (2000) and 1-301 (1973) read essentially the same, except for the reference to "[now the Attorney General for the District of Columbia]." Section 1-301 used the term "Commissioner" instead of "Mayor."

[26]  *See* 57 D.C. Reg. 6022 (July 16, 2010); 57 D.C. Reg. 3012 (Apr. 9, 2010); *see also* D.C. Council, Comm. on Pub. Safety & Judiciary, Report on Bill No. 18-65 at 1-2 (Dec. 16, 2009) (the "2009 Report") (stating that the legislation, which "codifies the institutional independence" of the office, "provide[s] greater structural independence" of the position, and makes clear that the Attorney General is "to act as the public interest requires").  A part of the legislation described making the position of Attorney General an elected position rather than an appointed one. *See Zukerberg v. District of Columbia Bd. of Elections & Ethics*, 97 A.3d 1064, 1068 (D.C. 2014).  However, "[b]ecause the Council is not empowered to amend the [District of Columbia Home Rule] Charter directly, the part of the bill proposing this change (Title II) was effectively a request for Congress to do so." *Id.*  Because Congress took no action to provide for election of the Attorney General after the legislation was transmitted to it, the Council decided to seek to amend the Charter by means of a voter referendum. *Id.* at 1069-

(continued…)

2010 legislation, the authority and duties of the Attorney General for the District of Columbia are as follows:

> (a)(1) The Attorney General for the District of Columbia . . . shall have charge and conduct of all law business of the said District and all suits instituted by and against the government thereof, and shall possess all powers afforded the Attorney General by the common and statutory law of the District *and shall be responsible for upholding the public interest.* The Attorney General shall have the power to control litigation and appeals, as well as the power to intervene in legal proceedings on behalf of this public interest.
>
> . . .
>
> (b) The authority provided under this section shall not be construed to deny or limit the duty and authority of the Attorney General as heretofore authorized, either by statute or under common law.

D.C. Code § 1-301.81 (a)(1), (b) (emphasis added). The Committee Report to the legislation cited with approval case law explaining that:

> [The] duties and powers [of the Attorney General] typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the attorney general of specific powers; but in the absence of such legislative action, [the Attorney General] typically *may exercise all such authority as the public interest requires*. *And the*

---

(…continued)

70. The Charter Amendment proposal providing for election of the Attorney General was presented to voters as part of the general election held on November 2, 2010, and the amendment was approved by a majority of the electorate and became law after the period of congressional review. *Id.* at 1070.

> *attorney general has wide discretion in making the determination as to the public interest.*

2009 Report at 4 (quoting *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268-69 (5th Cir. 1976) (emphasis added); *see also id.* at 4 n.13 (endorsing a statement by the National Association of Attorneys General that "the common law, if not expressly limited by constitution, statute, or judicial decision, provides power crucial to the fulfillment of an Attorney General's responsibility"). The Report states that the common-law powers of the Attorney General, "including the right to act on behalf of the public interest, indisputably flow with the position . . . absent specific constitutional or statutory guidance to the contrary." *Id.* at 4. Further, noting that a September 2008 memorandum prepared by D.C. Appleseed "helped to shape the current Committee Print," *id.* at 2, the Report explains (with approval) that according to D.C. Appleseed's research:

> [T]he common law powers of the Attorney General for the District of Columbia stem from Maryland common law as the District is derived from land ceded by that jurisdiction in 1801. As such, the law in existence in Maryland – including the common law – at that time became the law of the District. These common law powers . . . have since been specifically modified for the Maryland Attorney General through the acts of the state's General Assembly. However, no such deprivation of common law authority has been achieved through the District's Charter or through statute.
>
> While common law powers, once assumed, could be abrogated by statute doing so would need to be explicit.

A careful review of the District's Charter, and relevant statutory provisions pertaining to the Attorney General's authority, clearly reveal that no such deprivation has been achieved or attempted.

*Id.* at 5 (internal footnotes, quotation marks, and alteration omitted). The Council believed that the legislation would allow the Attorney General "to proceed with confidence by making clear in the law that he or she is the lawyer *for* the District of Columbia and is thus to act as the public interest requires." *Id.* at 2.

In sum, the legislative history of the current District of Columbia statute describing the powers of the Attorney General expresses in unequivocal terms the intent of the Council and the District of Columbia electorate that the District's Attorney General would be independent, and the intent of the Council that the Attorney General, no longer limited to being "under the direction of the Mayor," would have broad power to "exercise all such authority as the public interest requires" and "wide discretion" in determining what litigation to pursue to "uphold[] the public interest," "absent specific constitutional or statutory guidance to the contrary."[27] *Id.* at 4. As the District put it in its brief opposing appellees'

---

[27] One source of "guidance to the contrary" is D.C. Code § 23-101 (2012 Repl.), which assigns to the Attorney General of the District of Columbia responsibility to prosecute "violations of all police or municipal ordinances or regulations and . . . violations of all penal statutes in the nature of police or

(continued…)

motion to dismiss, and as its counsel re-asserted at oral argument, under § 1-301.81 (a), the "Attorney General thus has the responsibility, and the authority, to 'uphold the public interest' in D.C. by litigating on behalf of the public." (The District "is responsible for upholding the public interest" under "D.C. Code § 1-301-81 (a).") The Council understood that the Attorney General's powers in this regard could be curtailed legislatively only by statutes expressly abrogating his or her authority in specific contexts, and directed that (whatever limitations on the power of the Attorney General had previously been understood to exist) the revised statement of his authority was not to be "construed to deny or limit [his] duty and authority" as established under statute or common law.[28] At least two conclusions flow from

---

(…continued)

municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year" as well as violations "relating to disorderly conduct" or to "lewd, indecent, or obscene acts," *id.* § 23-101 (a) and (b); and which provides, in § 23-101 (c), that "[a]ll other criminal prosecutions shall be conducted in the name of the United States by the United States attorney for the District of Columbia or his assistants, except as otherwise provided by law."

[28] Appellees suggested at oral argument that to recognize this broad power of the District's Attorney General under § 1-301.81 would make ours "the first court to hold that an attorney general of a state can sue under any statute without statutory authority." But § 1-301.81, especially as understood in light of its accompanying Committee Report, itself establishes the requisite statutory authority (meaning that our analysis is most certainly not "ahistorical and atextual," as the dissent charges), and case law from numerous other jurisdictions likewise recognizes "a broad grant of authority [to the Attorney General,] which includes the power to act to enforce [the state's] statutes." *Botelho ex rel. Members of Alaskan Sports Bingo Joint Venture v. Griffin*, 25 P.3d 689, 692 (Alaska 2001)

(continued…)

(…continued)

("Under the common law, the attorney general has the power to bring any action which he thinks necessary to protect the public interest, a broad grant of authority which includes the power to act to enforce Alaska's statutes."); *see, e.g.*, *Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 366 (Ky. 2016) ("It is [the] discretionary duty [of the Attorney General] to choose those legal matters in the area of public litigation or quasi-judicial administration in which he believes it is his official duty to intervene, except in those instances when it is mandated by the legislature for him to intervene or to refrain from intervening. If he is mistaken in his legal advocacy, the courts and quasi-judicial tribunals always retain the power to rule against him and often do on the merits but this power does not affect his standing to become a party of interest in the cause or proceeding." (internal quotation marks omitted)); *State ex. Rel. Attorney Gen. v. Burning Tree Club, Inc.*, 481 A.2d 785, 797 (Md. 1984) (recognizing that in states where the Attorney General possesses common-law powers, he "has broad authority to initiate those suits which he believes are necessary to uphold the public interest"); *State ex rel. Bingaman v. Valley Sav. & Loan Ass'n*, 636 P.2d 279, 281 (N.M. 1981) (discussing a provision of state law that renders due-on-sale clauses unenforceable and holding that "[i]t is clear that the attorney general not only has standing to bring this lawsuit [to enforce the due-on-sale law], but also has the power and the duty to do so" pursuant to his "discretion in determining when the public interest requires him to bring a civil action on behalf of the state"); *Lowell Gas Co. v. Attorney Gen.*, 385 N.E.2d 240, 247-48 (Mass. 1979) (explaining, in response to an argument that "the Attorney General lacks standing [without] . . . a statutory grant of standing," that the Attorney General's consumer fraud allegations "were appropriately brought . . . in accord with the Attorney General's common law duty to represent the public interest"); *Mundy v. McDonald*, 185 N.W. 877, 880 (Mich. 1921) ("A broad discretion is vested in [the Attorney General] in determining what matters may, or may not, be of interest to the people generally."); *see also Associated Builders & Contractors, Saginaw Valley Area Chapter v. Perry*, 115 F.3d 386, 390 (6th Cir. 1997) (citing authority under Michigan law that a court "should only prohibit the Attorney General from . . . bringing an action when to do so 'is clearly inimical to the public interest'"); *Shell Oil*, 608 F.2d at 212 ("[W]e believe it is not fanciful to suppose that the state courts of Rhode Island would permit the Rhode Island . . . Attorney General to bring an action pursuant to [the State's Motor Fuel Distribution and Sales Act] to enjoin a refiner from unlawfully discriminating in the price he charges for petroleum, or to enjoin a wholesaler or reseller from

(continued…)

this and from the Attorney General's legislative mandate to "uphold[] the public interest" and to "act as the public interest requires."

First, the independence of the Attorney General from the Mayor and the Attorney General's Council-recognized authority to "exercise all such authority as the public interest requires," 2009 Report at 4, mean that the individual holding that office has enforcement authority that may go beyond that conferred by statute on the Mayor.[29]  To put a finer point on it, the independence of the Attorney General and his authority and responsibility to control or intervene in litigation as the public interest requires mean that even if the Council, in passing the RSSA in 1977,[30] intended to limit the enforcement authority of the *Mayor* — and thereby the enforcement authority of the Corporation Counsel or the pre-2010 Attorney

---

(…continued)
selling at retail level for less than four cents below his wholesale price [even though the Act explicitly authorizes suits only by franchisees or distributors].").

[29]  Thus, although perhaps interchangeable for some purposes, the terms "Mayor" and "Attorney General" are not entirely interchangeable.  It was misleading for the trial court to "refer[] to D.C. Attorney General and Mayor interchangeably when referring to the District official responsible for enforcing the [RSSA]."

[30]  *See* 24 D.C. Reg. 2371 (Sept. 30, 1977).

General, who served "under the direction of the Mayor"[31] — to Subchapters II and IV of the RSSA, and intended not to authorize those public officials to enforce Subchapter III, it does not follow that the enforcement authority of the now-independent Attorney General is so limited.

Second, the Council's statement that any abrogation or curtailment of the Attorney General's common-law powers "would need to be explicit" means that it was a misstep for the trial court to give the great weight it gave to the facts that the RSSA contains no explicit affirmative statutory authority for the Attorney General to enforce D.C. Code § 36-303.01 (a)(6) and (11) and likewise does not grant enforcement rights to "any person" aggrieved by a violation of the statute. As the District argues, "[t]hat [approach] gets the analysis backwards with regard to injunctive [and declaratory] relief, for which the question should be whether the legislature has affirmatively *precluded* a *parens patriae* suit" by the Attorney General.[32] The fact that the RSSA does not create an express right of action (and

---

[31] *See District of Columbia v. Pryor*, 366 A.2d 141, 143 (D.C. 1976) ("Subservience to the chief executive officer of the District government is the major thesis of this ["under the direction of the [Mayor]"] provision." (citing D.C. Code § 1-301 (1973)).

[32] We note by way of analogy that "states have frequently been allowed to sue in *parens patriae* [for injunctive relief] to . . . enforce federal statutes that . . . do not specifically provide standing for state attorneys general." *People ex*
(continued…)

may not include an implied right of action) for the Attorney General to enforce § 36-303.01 (a) does not answer the question of whether the Attorney General may do so pursuant to his statutory power and duty to uphold the public interest, as recognized (or established or reinstated) by D.C. Code § 1-301.81 (a)(1) and (b). In its opposition to appellees' motion to dismiss, the District made a similar point,

_____

(…continued)

*rel. Vacco v. Mid Hudson Med. Grp., P.C.*, 877 F. Supp. 143, 146 (S.D.N.Y. 1995); *see Snapp*, 458 U.S. at 609 (holding that Puerto Rico could "pursue the interests of its residents in the Commonwealth's full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act," without ever analyzing whether the underlying statutes permitted a State to sue).

Courts have refused to permit States (as well as others) to sue to enforce rights under a federal statute where Congress's carefully crafted and detailed enforcement scheme "carefully limits the parties who may seek relief." *Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 113 n.2, 121 (2d Cir. 2002) (holding that State was not permitted to sue to enforce various provisions of the ERISA statute, which broadly authorizes suits by the Secretary of Labor and by an ERISA plan "participant, beneficiary, or fiduciary . . . to enjoin any act or practice which violates any provision of this subchapter," but also precludes the Secretary from enforcing one specified provision and authorizes States to enforce one other specified provision, *see* 29 U.S.C. § 1132 (a)(3), (5), (7) and (b)(2) (citing *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 893 (2d Cir. 1983) (ruling that pension plans are not permitted to sue to enforce the ERISA statute))). And even where a State may sue for injunctive relief, suits for money damages may be precluded. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263-64 (1972) (reasoning that to permit both a State and its citizens to sue for damages "would open the door to duplicative recoveries").

arguing that its "enforcement authority is implied [even] in the absence of express authority [in the RSSA] to sue."

## 2. The RSSA

In this section, we address appellees' argument that there *is* an affirmative statutory preclusion of enforcement action by the Attorney General because, under the RSSA, authority to enforce Subchapter III purportedly "is vested *exclusively* in service station dealers."

D.C. Code § 36-303.06 (a) provides in relevant part:

> (a) (1) In addition to any and all other remedies available to the retail dealer under this subchapter, the marketing agreement, any other statute or act, or law or equity, a retail dealer may maintain a civil action against a distributor for:
>
> (A) Failure to make such disclosures as are required by § 36-303.02;
>
> (B) Failure to repurchase as required by § 36-303.04 (b);
>
> (C) Failure to pay the full value of any business goodwill as required by § 36-303.04 (d);
>
> (D) Wrongful or illegal cancellation of, termination of, or failure to renew a marketing agreement with the retail dealer under § 36-303.03;

(E) Unreasonably withholding approval of a proposed sale, assignment, or other transfer of the marketing agreement.

(2) The court may award actual damages, including ascertainable loss of goodwill as provided for in § 36-303.04 (d), sustained by the retail dealer as a result of the distributor's violation of this subchapter and may also grant such other legal or equitable relief as may be appropriate, including, but not limited to, declaratory judgment, specific performance, and injunctive relief.

D.C. Code § 36-303.06 (a)(1)-(2).[33]

We take appellees' point that, as originally codified, § 36-303.06, now entitled "Civil actions," was entitled "Retail Dealer's Cause of Action Against Distributor," and that the provision now codified as subparagraph (a)(2) was an unnumbered part of subsection (a) — a history that indicates that § 36-303.06 describes remedies available to retail dealers, not remedies more generally available. However, as the District emphasizes, the RSSA provides no express authority for *anyone* – retailers or anyone else – to enforce the marketing-

---

[33] The "other remedies available to the retail dealer under this subchapter," § 36-303.06 (a)(1), include non-judicial remedies described in § 36-303.04 (distributor-repurchase, equipment-removal, and compensation-for-loss-of-goodwill remedies, which themselves are "in addition to any and all other remedies available to the retail dealer under this subchapter, the marketing agreement, any other statute or act, or law or equity").

agreement restrictions of § 36-303.01 (a). Nevertheless, in *Davis v. Gulf Oil Corp.*, 485 A.2d 160 (D.C. 1984), this court expressed "certain[ty]" that the Council "intended to permit franchisees to seek relief from franchisors' violations of [the provision now codified as § 36-303.01 (a)(10) (prohibiting marketing agreements that are for a term of "less than 1 year")]," even though neither § 36-303.06 (a) nor any other section of the RSSA "expressly provide[s] any remedy for a violation of" the provision. 485 A.2d at 171 n.12. We did so notwithstanding the statement in the 1976 Report that the legislation would give retail dealers "a civil cause of action against the distributor *in certain circumstances*." 1976 Report at 59 (emphasis added). Thus, this court has already construed the RSSA as implying a cause of action to enforce one of the § 36-303.01 (a) marketing-agreement prohibitions despite the lack of express authority for anyone to enforce those provisions. Construing the RSSA to permit the District, through its Attorney General, to enforce § 36-303.01 (a)(6) and (11) can hardly be the unwarranted leap the trial court, appellees, and our dissenting colleague insist it would be. This is especially so given that, according to the District's complaint, the alleged exclusive-dealing arrangements are the product of multiple agreements (between Exxon and the distributors/franchisors, and between distributors and retail service station franchisees). Section § 36-303.06 (a), which expressly authorizes certain civil suits by retailers against their distributors suggests nothing about who should

have authority to sue distributors *and* their suppliers to enjoin exclusive-dealing arrangements that allegedly violate § 36-303.01 (a)(6) and (11). Moreover, any suggestion that the Council intended to authorize only retailers to bring such suits is undermined by the Council's express recognition, in enacting the RSSA, that a retail dealer "because of his limited resources" may be "ill equipped to sue . . . a financially powerful petroleum company." 1976 Report at 27.[34]

Appellees argue, however, that § 36-302.05 cabins the authority of the District to sue to enforce the RSSA by describing the Mayor's enforcement authority as to Subchapters II and IV while omitting mention of Subchapter III. Section 36-302.05 (a) provides that:

> The Mayor shall . . . cause a written order to be served upon such person [who "violat[es] any provision of subchapter II or IV of this chapter"] directing such person to immediately cease and desist from continuing such violation. If the person so ordered refuses or fails to comply with such order, the Mayor shall be authorized to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or permanent injunction restraining such person from continuing such violation.

---

[34] We note that *Davis* was not a suit brought by a retail-dealer franchisee; it originated as a suit by franchisor Gulf Oil to recover possession of the leased retail service station premises. *See* 485 A.2d at 162.

For the reasons already discussed in section B.1 above (relating to the independence of the Attorney General), we conclude that the RSSA provision describing the authority of the Mayor to sue does not address, and *a fortiori* does not limit, the authority of the Attorney General. We note in addition that the context of § 36-302.05 (a) is provisions in Subchapters II and IV that call for filings with or notice to the Mayor (*see* § 36-302.01 (a)-(b) (2012 Repl.) and § 36-302.04 (d) (2012 Repl.)), and establish the Mayor's power to adopt regulations to implement Subchapters II and IV (*see* § 36-302.04 (c)) and to grant (and, by implication, to withhold) exemptions from prohibitions established by the two Subchapters (*see* § 36-302.04 (a)-(b) and § 36-304.01 (2012 Repl.)). These provisions that establish an RSSA-implementation role for the Mayor are a logical explanation for the specification of the Mayor's authority to seek enforcement of Subchapters II and IV. A logical explanation for the absence of a provision authorizing the Mayor to seek enforcement of Subchapter III is that there are no comparable provisions specifying an RSSA-implementation role for the Mayor in Subchapter III. That implies nothing about whether there is a role for the independent Attorney General in suing to remedy what are alleged to be "widespread and systematic" violations of Subchapter III.

We conclude that the RSSA is not crafted in such a way as to compel a conclusion that the District's independent Attorney General is affirmatively precluded from seeking enforcement of § 36-303.01 (a)(6) and (11) in order to eliminate what the District alleges are widespread and systematic violations of those provisions of Subchapter III of the RSSA. And, more important (and perhaps dispositive) in light of the discussion in section B.1 above, the statute does not contain the clear expression of a legislative intent to curtail the Attorney General's enforcement powers. Such a clear expression would be necessary for us to conclude that the independent Attorney General is foreclosed by the RSSA from exercising his statutorily recognized common-law power to sue, in pursuit of what he believes the public interest requires, to enforce the RSSA marketing-agreement provisions that the Council determined were both necessary to foster a competitive gasoline market for the benefit of consumers and "in the interests of the public health, safety, and welfare."[35]

---

[35] D.C. Code § 36-305.01 (stating that "[t]his chapter shall constitute a statement of the public policy of the District of Columbia" and that "[t]he provisions of this chapter shall be liberally construed in order to effectively carry out the purposes of this chapter in the interests of the public health, safety, and welfare").

Nor can we agree with the trial court that the Council "deliberately" and "consciously chose" to withhold from the Attorney General the authority to enforce Subchapter III of the RSSA when it declined or failed to adopt the 2011 and 2014 proposed amendments that would have given the Attorney General not merely express authority to sue to enforce the RSSA, but also, *inter alia*, pre-complaint investigatory subpoena authority and authority to recover civil penalties. With the exception of one member, the Council that failed to pass Bill 19-299 in 2011 was identical to the Council that passed the 2010 legislation that recognized the broad powers of the Attorney General.[36]    For that reason,[37] the Councilmembers' failure to pass Bill 19-299 is just as consistent with an explanation that they understood that the Attorney General already possessed power to sue for declaratory and injunctive relief to enforce all of the provisions of the RSSA in pursuit of the public interest as it is with the inference (i.e., that the Council "did not intend to confer authority on the District to enforce" Subchapter

---

[36]  See the lists of members of the Council of the District of Columbia set out in the District of Columbia Official Code, 2010 Supplementary Pamphlet for Volume 2 Title 1, at III; and District of Columbia Official Code, 2011 Supplementary Pamphlet for Volume 2 Title 1, at III.

[37]  *Cf. Jackson v. District of Columbia Bd. of Elections & Ethics*, 999 A.2d 89, 106 (D.C. 2010) (en banc) (taking into account that "the Council that authored and, in April 1978, began consideration of the bill that became the [Initiative Procedures Act] was largely the same Council that passed the [Charter Amendments Act] in May 1977").

III of the RSSA) that appellees draw from the failed 2011 legislation. Moreover —

and this applies with respect to both the failed 2011 legislation and the similar

2014 legislation on which the Council took no action — as the Supreme Court has

admonished, "[f]ailed legislative proposals are a particularly dangerous ground on

which to rest an interpretation of a prior statute," because "[a] bill can be proposed

for any number of reasons, and it can be rejected for just as many others."[38] *Solid*

*Waste Agency of N. Cook Cty. v. United States Army Corps of Eng'rs*, 531 U.S.

159, 169-70 (2001) (internal quotation marks omitted); *see also In re McBride*, 602

A.2d 626, 637 (D.C. 1992) ("Various considerations of parliamentary tactics and

strategy might be suggested as reasons for the inaction of . . . Congress, but they

would only be sufficient to indicate that we walk on quicksand when we try to find

in the absence of corrective legislation a controlling legal principle." (quoting

*Helvering v. Hallock*, 309 U.S. 106, 121 (1940))).

Finally, appellees emphasize legislative-history language stating that RSSA

Subchapter III (contained in Title II of the Act) "deals exclusively with private

rights." 1976 Report at 64. This language appears in a section of the 1976 Report

that addresses the Title's expected "budgetary impacts" on the District and follows

---

[38] The District's brief explains that a controversial aspect of Bill 19-299 was a provision that would have prevented distributors from operating gasoline stations in the District.

a discussion of the budgetary impact of Titles I and III, which impose regular duties and responsibilities on the District of Columbia government to process informational statements, process exemption requests, promulgate rules and regulations, and perform other enforcement actions. *Id.* at 63-64 (stating that Title II, by contrast, "should have negligible budgetary impacts on the District" since it pertains to "private rights"). Elsewhere, however, in a non-"Fiscal Impact" section of the 1976 Report, the Council stated that the provisions of Title II of the RSSA are designed in part "to protect the general public." *Id.* at 29. Moreover, the Council found that non-competitive practices, including the "functional exclusive dealing arrangement[s]" prohibited by Title II, *id.* at 53, would "continue to have severe detrimental impacts on consumers in the District of Columbia," *id.* at 19, and that the new legislation would "enhance competition" to the benefit of consumers, *id.* at 22. In addition, as already noted, the Council decreed that the provisions of the RSSA "constitute a statement of the public policy of the District of Columbia" and are "in the interests of the public health, safety, and welfare." D.C. Code § 36-305.01. These expressions of legislative intent persuade us that dismissal of the District's suit cannot be justified on the ground that the RSSA provisions appellees allegedly violated pertain exclusively to retail dealers' and franchisors' "private rights" (so as to preclude the claimed cause of action).

For all the foregoing reasons, we conclude that the language and legislative history of the RSSA neither require nor support a conclusion that the Council meant to deny the Attorney General the authority to enforce D.C. Code § 36-303.01 (a)(6) and (11).

*** 

The trial court erred in dismissing the complaint for (1) the District's purported lack of standing and (2) the Attorney General's lack of express statutory authority to enforce D.C. Code § 36-303.01 (a).  Wherefore, the judgment of the Superior Court is reversed, and the matter is remanded for further proceedings.

*So ordered.*

EASTERLY, *Associate Judge*, dissenting:  The District sued the defendants in this case alleging a theory of standing that this division rejects:  relying on *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), the District asserted it had "*parens patriae* standing based on its quasi-sovereign interest in the economic well-being of D.C.'s gasoline consumers and the gasoline market." Although the burden to establish standing to sue is on the plaintiff, and injury to a quasi-sovereign interest under *Snapp* is the only theory of standing that the District

ever advanced in the trial court or this court, the majority opinion holds that the trial court "erred" when it granted the defendants' motion under Superior Court Civil Rule 12 (b)(1) to dismiss the District's complaint for lack of standing. *Ante* Part III.A. The majority opinion reaches this conclusion because it identifies a new *sovereign* interest theory of standing for the District—new not merely to this case, but to the law.

Under the majority opinion's new theory, the District has standing to sue whenever there is a D.C. Code provision the District believes is being violated. Relying on an array of inapposite cases, the majority opinion reasons that the District has a sovereign interest in the enforcement of every D.C. Code provision. *Ante* note 17. Under this logic, no statutory analysis or particularized inquiry into the District's injury is necessary: it is immaterial that the statutory provision at issue in this case only modifies common law contract rules between private parties. (In a footnote, the majority opinion indicates that there may be limits on permitting the District to act on every statutory violation, but whatever those limits are, in the view of the majority opinion, they do not matter in this case. *See infra* note 22.)

Procedurally and substantively, the majority opinion's analysis is problematic. First, because the plaintiff has the burden to show standing, this court

should not articulate for the District government a sovereign interest theory of standing that it has never pursued. Second, in light of our adoption of the Article III standing requirement that parties show concrete and particularized injury, this court should not adopt a sovereign interest theory of standing that so abstracts the Article III interest as to make the jurisdictional requirement of standing ineffectual when the District government, represented by the Attorney General, is the plaintiff, and that allows this court to disregard the prerogative of the legislature to statutorily define government interests.

The majority opinion also concludes that the trial court erred when it granted the defendants' motion to dismiss under Superior Court Civil Rule 12 (b)(6) because the District failed to identify a cause of action, either express or implied, in Subchapter III of the RSSA. Again, the majority opinion raises an argument that the District has never made and inverts the legal analysis for the government: although we have always required plaintiffs to show they have an express or an implied cause of action to survive a 12 (b)(6) challenge, and although the District has failed to show that it has either under Subchapter III of the RSSA, the majority opinion concludes that the District—when represented by the Attorney General— presumptively has a right to sue in the public interest unless the statute under

which the District seeks to sue expressly denies that authority to the Attorney General.

To support this proposition, the majority opinion looks to the 2010 Attorney General for the District of Columbia Clarification and Elected Term Amendment Act, D.C. Act 18-351 ("2010 Attorney General Act") (codified, as modified, at D.C. Code § 1-301.81 *et seq.* (2013 Repl.)), and concludes that, when the Council of the District of Columbia ("Council") "clarified" that the mayorally-appointed Attorney General had an independent obligation to act in the public's interest—not merely in the interest of the Mayor who had appointed him—it also gave the Attorney General powers that he previously did not possess to sue in the public interest. The majority opinion engages in a statutory analysis that is supported neither by the text nor the historical record. Thus, even if I agreed that we should look to the 2010 Attorney General Act instead of Subchapter III of the RSSA to identify the District's cause of action, I see nothing in that statute indicating that the District, via its Attorney General, has a broad right to sue to enforce any statute (and hence Subchapter III of the RSSA) in the public interest.

Because the trial court did not err in dismissing the District's case either for lack of standing or for failure to identify a cause of action, I respectfully dissent.

# I. Standing: The 12 (b)(1) Ruling

## A. The Plaintiff's Burden To Establish Standing

The majority opinion correctly acknowledges that standing is a threshold jurisdictional question, *see Grayson v. AT & T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc), and that, although this court was created by Congress under Article I of the Constitution, we have adopted the three-part test for standing used in Article III courts: injury-in-fact, causation, and redressability. *UMC Development, LLC v. District of Columbia*, 120 A.3d 37, 42–43 (D.C. 2015). But the majority opinion nowhere acknowledges that the plaintiff, whether a private individual or a government entity, bears the burden to establish that these three criteria are satisfied.[1] *Id.* ("The plaintiff bears the burden to establish standing." (citing *Grayson*, 15 A.3d at 246)); *accord Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing [the three] elements [of standing]."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears

---

[1] The majority opinion instead emphasizes that this court must construe all *factual* allegations in the complaint in the District's favor. *Ante* p. 27. This proposition is unquestionably correct, but it does not permit us to raise new *legal* theories of standing on the District's behalf.

the burden of establishing the [Article III] elements [of standing] . . . [which] are not mere pleading requirements but rather an indispensable part of the plaintiff's case."); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888) ("[T]he right of the government . . . to institute . . . a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief . . . .").[2] A court may raise questions at any time about a plaintiff's standing and the court's subject matter jurisdiction, *Riverside Hosp. v. District of Columbia Dep't of Health*, 944 A.2d 1098, 1103 (D.C. 2008), but where, as here, the

---

[2] The majority opinion suggests that, in *United States v. Am. Bell Telephone Co.* 128 U.S. 315 (1888), the Supreme Court "clarified" that different standing rules apply to the government. *Ante* note 22. But to support this proposition the majority incompletely quotes that case quoting *San Jacinto*. Read in full, the Court (in both cases) was explaining that the government must prove standing to sue just like any private citizen:

> [S]ince the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. . . . [I]f there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances.

128 U.S. at 367 (quoting *San Jacinto*, 125 U.S. at 286).

defendants successfully challenged the plaintiff's standing to sue in the trial court, it is not our place to supply the plaintiff with a new legal theory of standing on appeal. Instead, when we agree with the trial court that the legal theory of standing the plaintiff raised is not viable, we must affirm the trial court's ruling dismissing the plaintiff's suit for lack of standing.[3]

The only theory of standing that the District ever advanced in this case is a theory that has been rightly rejected—first by the trial court and now by the majority opinion, *see ante* Part III.A.1. The District argued in the trial court and in this court that a significant segment of its population was harmed by defendants' marketing agreements with gasoline retailers, and the District claimed a quasi-sovereign interest to sue on their behalf under *Snapp*. As the majority explains, *see ante* pp. 15–17, quasi-sovereign interests are so called because they are the interests a state has in the health and well-being of a substantial segment of its population under the law of a *different* sovereign, that of the federal government. *Snapp*, 458 U.S. at 602, 607. It is the cognizable harm to this substantial segment of the population under federal law that allows a state, as *parens patriae*, to evade

---

[3] Only to the extent that the dismissal is without prejudice. *See UMC Development*, 120 A.3d at 48 (explaining that a plaintiff's failure to allege standing to sue must result in dismissal without prejudice because the dismissal is not on the merits of the action). Thus an affirmance would not foreclose the plaintiff from returning to the trial court and attempting to prevail on a new legal theory.

prudential standing limitations on raising the rights of third parties in federal court. *Id.*[4] The state still must satisfy all three Article III requirements; in particular, it must show a concrete injury to its interests under federal law: "more must be alleged than injury to an identifiable group of individual residents," *Snapp*, 458 U.S. at 607, and the state must be more than a "nominal party," *id*. at 602 (explaining that "[i]nterests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement"); *see also id*. at 608 ("caution[ing] that the State must be more than a nominal party").[5]

Here, the District sought to claim, under *Snapp*, that it had standing to sue based on an unquantified injury to an undefined segment of the population due to appellees' alleged violation of a provision of the District's law, Subchapter III of

---

[4] *See also Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 971 (9th Cir. 2009) (characterizing a quasi-sovereign interest as more than simply aggregated private interests and noting that the state would be precluded, under prudential standing doctrine, from asserting the legal rights of third parties).

[5] In *Snapp*, the Court determined that Puerto Rico's quasi-sovereign interests were implicated such that it had standing to sue in federal court where it alleged and substantiated, *see id.* at 597–98, "that the petitioners discriminated against Puerto Ricans in favor of foreign laborers" in violation of federal law, and that "Puerto Ricans were denied the benefits of access to domestic work opportunities that the Wagner-Peyser Act and the Immigration and Nationality Act of 1952 were designed to secure for United States workers." *Id.* at 608.

the RSSA, that governs private contractual agreements between distributors and retailers of gasoline. Arguably, the District never satisfied Article III requirements to show that the distributors' alleged violations of Subchapter III injured the District's interests in the well-being of its populace as a whole, or even a substantial segment thereof.[6] In any event, the majority opinion agrees that *Snapp* has no application to the District's asserted right to act as *parens patriae* to pursue a claim under its *own* law in its *own* courts.

The majority opinion reasons, however, that "[t]he District was not required to assert injury to a quasi-sovereign interest to establish standing to sue." *Ante* p. 14. I agree that the District was free to make any standing argument it desired, but the record is clear that it opted to pursue only one (misguided) standing argument,

---

[6] The majority opinion, having explained that the District cannot assert injury to a quasi-sovereign interest under *Snapp*, nonetheless applies the test for quasi-sovereign injury and concludes that the District had sufficiently alleged injury, as required under *Snapp*, to a sufficiently substantial segment of its population. *See ante* note 12. Even under this inapposite legal theory, the District did not sufficiently plead injury. The District asserted in its complaint only that "many thousands of consumers in D.C." were being denied unspecified "benefits of competition" as a result of the distribution agreements it wished to challenge. The District never explained in more concrete terms what injury consumers suffered as a result of that denial. Moreover, the District conceded at oral argument before this court that the "many thousands" number was a guesstimate, or as they put it, a "quantification . . . of the approximate number of people who would be affected" based on the District's assertion in the complaint that appellee CPG owns 27 of the 31 Exxon branded gasoline stations in the District, which it in turn asserted was "about 25% of all the gasoline stations in the District."

namely that it had an injury to its quasi-sovereign interests under *Snapp*. In its complaint, the District asserted that it had authority to "bring[] this action as *parens patriae* on behalf of the residents, general welfare, and economy of D.C." In its Opposition to the Defendants' Motions to Dismiss, the District elaborated and made its sole standing argument clear: citing to or quoting from *Snapp* on almost every page of its eight-page standing analysis, the District argued that, as required by *Snapp*, it had alleged injury to "a sufficiently substantial portion of the population," and, as authorized by *Snapp*, it was "bring[ing] this action to protect its quasi-sovereign interest in the well-being of its local economy," which it linked to the "economic health of 'the consuming public.'" The District reiterated these arguments at the hearing on the defendants' motions to dismiss, citing *Snapp* and asserting that the District was "suing as an injured quasi-sovereign to [redress] injuries to the D.C.'s economy." After the hearing on the motion, the trial court gave counsel another opportunity to submit "a short, no more than five pages, clarification of arguments or a correction of misstatements by yourself or by the other side." In its responsive filing, the District reiterated that the foundation for its standing argument was "the Supreme Court's holding in the seminal case of *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982)."

Thus, at the District's direction,[7] the trial court analyzed the District's standing under *Snapp*.[8] Notably, the District has never argued that the trial court had too narrowly construed its standing argument. Instead, on appeal, the District has renewed its argument that it has a quasi-sovereign interest under *Snapp*. In its Summary of Argument, it explains that, "[i]n order to sue as *parens patriae*, the District must allege injury to a quasi-sovereign interest that affects a substantial segment of the District's residents." In the body of its brief, it then exclusively argues that under *Snapp* and its progeny it "has adequately—at minimum

---

[7] The majority opinion appears to fault defendants/appellees for injecting *Snapp* into this case. *Ante* p. 15. Arguably, the defendants only challenged the District's standing under *Snapp* because the District, in its complaint, appeared to be invoking the *parens patriae* language of *Snapp*. In any event, if the District disagreed with the framing of defendants' arguments in their Motions to Dismiss, and never believed itself to have quasi-sovereign standing under *Snapp*, the District had the obligation—as plaintiff carrying the burden of proof on this jurisdictional issue—to say so in its opposition and to articulate its theory of standing to sue in this case. The District did not do this. Instead, it embraced *Snapp*, made it the foundation of its standing analysis, and explicitly argued in the trial court that its "*parens patriae* standing [wa]s clear based on *Snapp*" and its progeny.

[8] The majority opinion also appears to fault the trial court for misconstruing the District's argument, noting that "the statement in the District's complaint that it was bringing suit in its *parens patriae* capacity need not be read as an invocation of the quasi-sovereign interest/*parens patriae* doctrine discussed in *Snapp*." *Ante* note 17; *see also infra* note 13 (explaining the origins and difference between the two uses of "*parens patriae*"). But as detailed above, that is precisely what the District asked the trial court to do. *See ante* p. 21 (conceding that the District "focus[ed] its briefing . . . in the trial court, on whether its complaint sufficiently pled a quasi-sovereign interest" under *Snapp*).

*plausibly*—alleged injury to a quasi-sovereign interest here, and should be allowed to proceed with its complaint."[9]

---

[9] The majority opinion nevertheless asserts that the District's standing argument before this court was not limited to asserting its quasi-sovereign interest under *Snapp*, alternately stating that "the District has not entirely overlooked" the distinct principles of standing that the majority opinion now determines apply to this case regarding sovereign injury, *ante* p. 21, and that the District has "undeniably advanced" a sovereign interest theory of injury in this case, *ante* p. 26. But, to support these differing propositions, the majority opinion quotes from portions of the District's brief discussing its theory of quasi-sovereign injury under *Snapp*. *Ante* pp. 21, 26. And the majority opinion ignores the fact that elsewhere in its brief, the District (1) acknowledged "other interests a state can sue to protect," among them, "sovereign interests," and then (2) explained it had standing based on a quasi-sovereign interest, which "stand[s] apart" from those "other interests." The District never argued that any of the "other interests" it had expressly acknowledged gave it standing to sue.

The majority opinion also relies on an exchange at oral argument with counsel for defendants/appellees as evidence that the District did not limit its standing argument before this court to asserting an injury to its quasi-sovereign interests under *Snapp*: "when asked whether the District had in effect asserted a sovereign interest, counsel for the Distributors did not disagree with that characterization." *Ante* note 14. I disagree with this characterization of what was said at oral argument. When counsel for the distributors was asked "whether this is a sovereign interest the District is attempting to enforce," counsel unequivocally answered "no . . . . there is no injury to the District of Columbia." Counsel was then asked, "had [the District] described [its interest] as . . . a sovereign interest, would it have been on good footing?" prompting counsel to respond, "I don't think anything would be different," both because the District lacked a cause of action, and because "you can't just assert a sovereign interest . . . [or] mouth the words *parens patriae*." Moreover, if we are looking for implicit concessions at oral argument, we should look no further than the District's response to the very first question from the bench, inquiring why the District "ha[d] not asserted a sovereign interest as opposed to a quasi-sovereign interest" as a basis for its standing to sue. The District did not protest that it had. Instead after stating it had "an interest akin to a sovereign interest" as the majority opinion quotes, it maintained it had a

(continued…)

Although the majority opinion rejects the District's only standing argument, based on *Snapp*, it does not hold as it should that the trial court was correct to dismiss the District's complaint for lack of standing. Instead, the majority opinion supplies a new theory of "sovereign" interests to satisfy the standing requirement for the District. I disagree substantively with this new theory. *See infra* note 11. But foundationally, I think it is procedurally improper for this court to articulate for the District government a legal theory of standing that it has never pursued. Absent special circumstances (which no one has suggested exist in this case), we would not permit a plaintiff to raise a new legal theory of standing for the first time on appeal. *See, e.g.*, *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (explaining that the rule that "legal theories not asserted at the District Court level ordinarily will not be heard on appeal . . . . applies to standing, as much as to merits[] arguments, because it is not the province of an appellate court to 'hypothesize or speculate about the existence of an injury [Plaintiff] did not assert'

---

(…continued)
"quasi-sovereign interest," which it explained "is the terminology that's used in the parens context in order to define a state's interest which might be different than a state's sovereign interest." Although much later, on rebuttal, the District made the single statement quoted by the majority that it had "sovereign authority," in the same breath, it reiterated that its standing argument was grounded in *Snapp*. This single statement at oral argument does not give this court license to flesh out and endorse on appeal a theory of standing that the District never advanced in the trial court or in briefing to this court.

to the District Court."); *see also id.* at 1280 n.4 (citing cases). I fail to see why this court on appeal may raise a new theory of standing for a plaintiff sua sponte, thereby relieving the plaintiff of its burden to prove its standing to sue, and then grant the plaintiff relief on that basis.

## B. The Majority Opinion's Unfounded Theory that the District Has Suffered an Injury to its Sovereign Interest

Even if this court may identify a new, "sovereign interest" theory of standing for the District, that theory would still have to satisfy the three "irreducible" requirements of Article III standing. *Grayson*, 15 A.3d at 234 n.26. But this endeavor fails at the first step; the District has no cognizable interest in the enforcement of Subchapter III of the RSSA—a provision that deals with private contractual agreements between distributors and retailers of gasoline—such that it can claim the necessary "concrete and particularized" injury, *id.* at 246.[10]

---

[10] The majority opinion does not address the next steps in the Article III standing inquiry—causation (which the District disclaimed a need to prove and which the trial court appears to have found lacking) and redressability. Instead, the majority opinion, having discerned only that the District has a sovereign interest that could be injured, discontinues its standing analysis.

There are three types of interests that a government may assert have been injured to supply a foundation for Article III standing: sovereign, quasi-sovereign, and proprietary. *Snapp*, 458 U.S. at 601–02. The latter two patently have no application here, because the District is seeking neither to vindicate its interest in the well-being of its citizens under federal law in federal court nor to protect its own property interests.[11] This leaves the District's sovereign interests.

The majority opinion discerns that the District has a sovereign interest in private, contractual agreements between distributors and retailers of gasoline, because these agreements are the subject of a statute, and a government always has a sovereign interest in enforcing its own statutes. I disagree with the majority opinion's broad declaration that "a government is injured when[ever] its laws are violated," *ante* p. 24. Instead, to determine whether there is a sovereign interest and thus sovereign injury, we must look to the statute under which the District claims standing to sue—here, Subchapter III of the RSSA. Based on my examination of the text of Subchapter III, the RSSA as a whole, and the legislative

_____

[11] Beyond discrete property holdings, a state has an interest in the "maintenance and recognition of [its] borders," *Snapp*, 458 U.S. at 601, which are sometimes described as "quasisovereign" interests, *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 258–59 (1972), or "sovereign" interests, *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447–49 (1945). Whatever the proper nomenclature, this interest is obviously not implicated in this case.

history of that Act, *see infra* Part I.B.2, I see no indication that Subchapter III is meant to protect anything other than private, proprietary interests.

## 1.    Assessing Sovereign Interests

Preliminarily, it is important to acknowledge the origins of sovereign power and concede the fact that neither we, as a court, nor the Office of the Attorney General, as an agent of the executive, have the authority to create or define the sovereign interests of a state.  This power was derived from the sovereignty of the king and was passed from the crown to the state legislatures upon our nation's independence,[12] *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States* (*Mormon Church*), 136 U.S. 1, 56–58 (1890):

---

[12]    The sovereign authority of the Council has a distinct origin—the Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973)—and its legislative authority not only has significant substantive limits, *see* D.C. Code § 1-204.04 (2014 Repl.); D.C. Code §§ 1-206.01, 1-206.02 (2001), but also may be overridden by Congress, which retains plenary legislative authority over the District, *see* D.C. Code § 1-201.02 (a) (2001); § 1-206.01.  The majority opinion acknowledges that "the District is merely akin to a sovereign state," *ante* p. 19, but assumes that because the District is a "sovereign for many purposes," it is sovereign for standing purposes, *ante* p. 20.  If that assumption is correct, it seems we should not diminish the Council's sovereign power by allowing the executive to exercise power the Council has not given it, or by giving the executive that power ourselves.

> When this country achieved its independence, the prerogatives of the crown devolved upon the people of the states. And this power still remains with them, except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment.[13]

*Id*. at 57.

A state legislature wields its sovereign power "to create and enforce a legal code, both civil and criminal." *Snapp*, 458 U.S. at 601. But in exercising this

---

[13] It is true that the sovereign power to act as *parens patriae* to protect the most vulnerable members of our society—in the parlance of a different era, "charities, infants, idiots, [and] lunatics," *Mormon Church*, 136 U.S. at 58—also transferred from the King to the states, and that state executives, even without the exercise of legislative authority, have the common law sovereign authority to sue on these persons' behalf. *Id*. at 57; *see also Snapp*, 458 U.S. at 600 (explaining that this common law sovereign authority to sue to protect persons with legal disabilities "has relatively little to do" with "*parens patriae* standing," i.e., states' ability to raise a quasi-sovereign interest a state has in the well-being of a substantial number of its citizens under federal law). But this common law sovereign authority is frozen in time and is no longer subject to expansion by the courts. *See Snapp*, 458 U.S. at 600 (noting that "American courts recognized this common-law concept, but now in the form of a legislative prerogative").

Thus, to the extent the majority opinion makes a separate argument that the District in this case also had standing to "bring suit . . . as *parens patriae* to pursue matters arising under local law," *ante* note 17, I cannot agree. The majority cites cases that concern the groups protected under the common law sovereign *parens patriae* authority—i.e., charitable trusts and children. Only the legislature may expand the District's *parens patriae* authority beyond its now static boundaries. The majority opinion cites no case that permits the District to sue "as *parens patriae*" in a manner other than that authorized at common law or explicitly by statute.

power, the legislature is not articulating sovereign interests in every law it passes.[14]

Instead, a state legislature may define and protect an array of interests. Looking at the D.C. Code, there are (1) civil statutes that protect the District's sovereign interests, both (a) statutes codifying common law *parens patriae* powers, *see supra* note 13,[15] and (b) statutes expanding those *parens patriae* powers;[16] (2) civil statutes that protect the District's proprietary interests;[17] and (3) civil statutes that

---

[14] Whether the agents of the state government may *defend* a statutory provision the legislature has enacted is a separate question from whether the legislature intended for agents of the government to affirmatively enforce it against other parties. "No one doubts that a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional. To vindicate that interest or any other, a State must be able to designate agents to represent it in federal court." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2664 (2013) (citations omitted)).

[15] *See, e.g.*, D.C. Code § 16-2305 (2013 Repl.) (giving the District the power to file neglect petitions for juveniles); D.C. Code § 21-541 (2013 Repl.) (authorizing the District to file civil commitment petitions).

[16] *See, e.g.*, D.C. Code § 28-4507 (b)–(d) (empowering the District to "bring a civil action in the name of the District . . . on behalf of any individual residing in the District . . . for injury sustained by such individual to such individual's property by reason of any violation of" the antitrust laws).

[17] *See, e.g.*, D.C. Code § 28-4507 (a) (authorizing the District to "bring a civil action . . . for damages" against a private party when the "government is injured in its business or property by a violation of" antitrust laws).

protect purely private interests.[18]   Criminal laws are different; they express only

sovereign interests.[19]

Thus, we cannot automatically conclude that the mere existence of a statute,

no matter the content, signals the existence of a sovereign interest.  We must look

to the particulars of a civil statute to determine if a sovereign interest is being

protected, such that the government can claim standing to sue.  *See Spokeo*, 136 S.

Ct. at 1549 ("Congress has the power to define injuries and articulate chains of

causation that will give rise to a case or controversy where none existed before."

(cleaned up)); *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529

U.S. 765, 773 (2000) (noting that Congress can "define new legal rights, which in

turn will confer standing to vindicate an injury caused to the claimant"); *Sierra*

*Club v. Morton*, 405 U.S. 727, 731–32 (1972) ("[T]he inquiry as to standing must

begin with a determination of whether the statute in question authorizes review at

the behest of the plaintiff."); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("The

---

[18]   *See, e.g.*, D.C. Code §§ 42-501 to -523 (2001) (regulating estates in land).

[19]   It is a foundational premise of our criminal justice system that the violation of a criminal law causes actionable injury to the state itself—not to any complainant.  *See In re Taylor*, 73 A.3d 85, 96 (D.C. 2013) (clarifying that a private party may not prosecute another for a crime because "our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed" (cleaned up)).

actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'"). And we apply established rules of statutory interpretation. *See United States v. James*, 478 U.S. 597, 604 (1986) ("The starting point in statutory interpretation is the language of the statute itself. We assume that the legislative purpose is expressed by the ordinary meaning of the words used." (cleaned up)); *see also District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 651 (D.C. 2005) ("The text of an enactment is the primary source for determining its drafters' intent.").[20]

This is where the majority opinion, having sua sponte raised a "sovereign interest" theory of standing on behalf of the District, takes another wrong turn. The majority opinion does not apply tools of statutory interpretation to D.C. Code § 36-303.01 (a)—part of Subchapter III of the RSSA—to determine what interests the Council created therein. Indeed, in conducting its standing analysis, the majority opinion ignores the text of D.C. Code § 36-303.01 (a), the structure of the RSSA as a whole, and its legislative history.[21] Instead, it rests its standing analysis

---

[20] There is one exception to this rule: we do not conduct a textual analysis of criminal statutes to assess whether they protect a sovereign interest and thus give the government standing to sue, because, as explained above, unlike the civil legal code, criminal statutes define *only* sovereign interests. *See supra* note 19.

[21] The majority opinion considers the text of the RSSA in its Rule 12 (b)(6) analysis, *see ante* Part III.B, for a different purpose: to determine if the statute

(continued…)

on the broad, unsupported legal conclusion that the legislature *always* defines a sovereign interest when it passes a law, i.e., the act of legislating on any subject, in any manner, itself evinces a sovereign interest in the enforcement of that law.

The majority opinion presents its theory as a well-established proposition: "Case law establishes that a government is injured when its laws are violated." *Ante* p. 24. But this blanket assertion, without limitation or qualification, is not supported by a single appellate decision cited by the majority opinion.[22] Instead,

_____

(…continued)
expressly deprives the Attorney General of what the majority understands to be a broad right to sue in the public interest, unless expressly limited by statute. *But see infra* Part II.

[22] The majority opinion states in a footnote that it is not "say[ing] that the District may sue as *parens patriae* to enforce *every* District of Columbia law," *ante* note 15, and cites *Shell Oil Co. v. Noel*, 608 F.2d 208, 212 (1st Cir. 1979), for the proposition that there is a distinction between statutes "declaring conduct unlawful" and statutes that "determine[] the right of one person to recover from another." Thus the majority opinion appears to hold open the possibility that the District might not be permitted to enforce a statute if the statute protects purely private interests. But the majority opinion does not actually disclaim the broad statement that the District has a sovereign interest in the enforcement of every D.C. Code provision. Moreover, other than asserting, without supporting citation, that Subchapter III of the RSSA is a "statutory *prohibition*[] imposed to foster competition for the benefit of consumers," *ante* note 15, the majority opinion never explains why this provision, whose plain language only addresses private rights, *see infra* Part I.B.2, does not fall into the latter category of statutes.

In this respect, the majority opinion's citation to *Shell Oil* is curious. In that case, a private company sought to sue the executive officers of a state government
(continued…)

the opinion takes out-of-context statements from cases in which the statutes at issue explicitly define sovereign interests.

The majority opinion relies on three criminal cases (two of which are unpublished), *see ante* note 18, but, as explained above, criminal statutes define *only* sovereign interests. *See supra* note 19. Thus these cases cannot be relied upon to support a broader theory of "sovereign" injury that extends to any civil statutory violation. Furthermore, an examination of what these cases actually say reveals that they do not purport to do so. In *United States v. Yarbrough*, 452 F. App'x 186 (3d Cir. 2011), the Third Circuit stated only that "[t]he Government doubtlessly suffers an 'injury in fact' when a defendant violates its *criminal* laws."

---

(…continued)

to enjoin enforcement of a state law regulating the sale of petroleum products. The First Circuit affirmed the district court's decision to dismiss the case on standing grounds, because the state had never sought to enforce the statute against the company, and it was not clear that the state could do so. The First Circuit concluded it was an unsettled question of state law whether the statute in question created a "mere tort or wrong" for the purchaser against the petroleum company, or whether it "indicate[d] . . . a wrong against the general public, which injures the general welfare, and which if done in accordance with the agreement of two or more persons would support" criminal enforcement action by the State. 608 F.2d at 212. Though the majority opinion in this case has framed the issue as whether Subchapter III of the RSSA creates a sovereign interest, the majority opinion declines to conduct the particularized analysis of the statute that the First Circuit in *Shell Oil* indicated would be necessary to determine the nature of the interest protected; instead the majority opinion simply declares that "a government is injured when its laws are violated." *Ante* p. 24.

*Id.* at 189 (emphasis added). Thus its rejection in the next sentence to the defendant's standing challenge, "because the Government has standing to enforce its own laws," *id.*, is only reasonably interpreted as a recognition of the government's "standing to enforce its own [criminal] laws." Similarly, in *United States v. Daniels*, 48 Fed. App'x 409 (3d Cir. 2002), the Third Circuit stated only that, "[a]s sovereign, the United States has standing to prosecute violations of valid *criminal* statutes." *Id.* at 418 (emphasis added). And in this court's decision in *Crockett v. District of Columbia*, 95 A.3d 601 (D.C. 2014), we confirmed only that "the Attorney General has an interest, sufficient to confer standing, in the enforcement of the *criminal* laws of the District of Columbia." *Id.* at 605 (emphasis added).

The majority opinion also cites an array of civil cases that do not support its theory that the District has a sovereign interest in the enforcement of all District statutes. Many of these cases interpret distinctive *qui tam* statutes, which allow private parties to bring suit in the name of the government to vindicate the government's sovereign and proprietary interests. First among these is the Supreme Court's decision in *Vermont Agency*, which examines a private plaintiff's

rights to sue under the False Claims Act, a hybrid criminal/civil statute.[23] The majority opinion incompletely quotes *Vermont Agency* as stating that "[i]t is beyond doubt that the complaint asserts an injury to the United States[,]" i.e., an "injury to its sovereignty arising from violation of its laws[.]" *Ante* p. 24 (quoting 529 U.S. at 771). But when the quoted sentence is read in full, it supports only the much more limited (and uncontroversial) proposition that the federal government has a sovereign interest in the enforcement of its criminal laws and a proprietary interest in challenging false claims for payment of government funds:

> It is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a *criminal lawsuit* by the Government) and the *proprietary injury* resulting from the alleged fraud.

---

[23] The text of the False Claims Act clearly indicates that the federal government has proprietary interests at stake, which Congress has authorized a private party to invoke in a civil suit. *See* 31 U.S.C. § 3729 (a)(1) (defining "[l]iability for certain acts" that constitute "false claims" and makes all persons who perform such acts "liable to the United States Government for a civil penalty"); § 3730 (a) ("[T]he Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person."); § 3730 (b) (authorizing a private party to bring the same civil action "in the name of the Government"); *see also Vermont Agency*, 529 U.S. at 771 ("[T]he complaint asserts a[] . . . proprietary injury [to the United States] resulting from the alleged fraud.").

529 U.S. at 771 (emphases added). The other *qui tam* cases cited by the majority, *ante* note 18, are derivative of *Vermont Agency*, and their statements about the government's standing to enforce its own laws reflect only the determination that the statutes at issue in those cases defined a sovereign injury.[24]

In addition, the majority opinion cites a few non-*qui tam* civil cases. *Ante* notes 18 & 21. Some have no application to the question in this case.[25] The

---

[24] *See Stauffer v. Brooks Bros.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("Congress has, by enacting [the false marketing provision in the Patent Act, another statute containing *qui tam* provisions], defined an injury in fact to the United States. In other words, a violation of *that* statute inherently constitutes an injury to the United States. In passing the statute prohibiting deceptive patent mismarking, Congress determined that such conduct is harmful and should be prohibited. The parties have not cited any case in which the government has been denied standing to enforce its own law." (emphasis added)); *Newt LLC v. Nestle USA Inc.*, No. 09-C-4792, 2011 U.S. Dist. LEXIS 32837, at *4–5 (N.D. Ill. Mar. 28, 2011) ("By enacting [the Patent Act], Congress defined an injury in fact to the United States. The government always has standing to enforce its own laws and, thus, a relator, as the government's assignee, also has standing to enforce [this provision of the Patent Act]." (citing *Stauffer*, 619 F.3d at 1325)); *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-cv-168-wmc, 2011 U.S. Dist. LEXIS 55011 (W.D. Wis. Mar. 15, 2011) (The false marketing provision of the Patent Act "is a qui tam provision . . . . Because 'Congress has, by enacting [the false marketing provision], defined an injury in fact to the United States,' Hy Cite also has standing to assert that injury." (citing *Stauffer*, 619 F.3d at 1325)).

[25] The majority opinion quotes a passage from *In re Debs*, 158 U.S. 564, 584 (1895) a habeas case in which union officials who had been held in criminal contempt and imprisoned for violating an injunction ordering them to discontinue a railway strike challenged the government's standing to seek such an injunction. In the passage quoted by the majority opinion, the Court observed only that the

(continued…)

remainder do not support the majority opinion's broad conception of a sovereign interest in the enforcement of all statutes; they refute it.  As the majority itself acknowledges, *ante* p. 26, the courts in these cases analyze the *text* of the particular statute sought to be enforced to discern the sovereign interest.[26]

---

(…continued)

government did not have to assert a proprietary interest in order to establish its standing (although the Court determined that the government in fact had a "property [interest] in the mails"). *Id.* at 584.  The Court then determined that the federal government had standing to seek an injunction based on its constitutionally-based sovereign interests (also reflected in implementing statutes) in regulating interstate commerce. *Id*. at 586–92. *In re Debs* does not support the majority opinion's broad holding that a government has standing to sue whenever any of its laws are violated and is entirely distinguishable, in light of both the nature and origin of the sovereign interest at stake and the "special exigency" of the railway strike at issue in that case. *Id*. at 592.  The majority also cites *Castillo v. Cameron Cty.*, 238 F.3d 339, 351 (5th Cir. 2001), but that case addressed a state's nonparty standing to appeal an injunction and, applying the three-part test already established in that jurisdiction to resolve that issue, the Fifth Circuit held that the state could appeal. *Castillo* provides no support for the majority opinion's holding that a government has standing to initiate a law suit whenever any state statute has been violated.

[26] *See Bhd. of Ry. & S.S. Clerks v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 242 n.4 (1966) ("[W]e have no doubt that the United States had standing to bring this action," because the statute "ma[d]e[] it the duty of the United States attorney to institute in the proper court and to prosecute all necessary proceedings for the enforcement of [the section of the Act the company was] charged with violating." (cleaned up)); *EEOC v. Day & Zimmerman NPS, Inc.*, 15-cv-1416, 2017 U.S. Dist. LEXIS 133918 at *20–21 (explaining that "[t]he EEOC has standing to pursue this action" because "[t]hrough the ADA, Congress has charged the EEOC with the function of 'prevent[ing] any person from engaging in any unlawful employment practice' that violates the ADA." (quoting 42 U.S.C. 2000e-5 (a))); *EEOC v. Celadon Trucking Servs.*, No. 1:12-cv-00275-SEB-TAB, 2015 U.S. Dist. LEXIS 84639 (S.D. Ind. June 30, 2015) ("[T]he EEOC's standing to bring a suit challenging a violation of the ADA . . . stems directly from the statute, and the

(continued…)

## 2.     Interests Defined in Subchapter III of the RSSA

The District alleged in its complaint that the defendants had entered into contracts for the distribution of gasoline that violated D.C. Code § 36-303.01 (a)(6) & (11), a provision in Subchapter III (governing Marketing Agreements) of the RSSA, which states:

> All marketing agreements shall be in writing and shall be subject to the nonwaiverable conditions set forth in this section, . . . . [and n]o marketing agreement shall: . . .
>
> (6) Prohibit a retail dealer from purchasing or accepting delivery of, on consignment or otherwise, any motor fuels, petroleum products, automotive products, or other products from any person who is not a party to the marketing agreement or prohibit a retail dealer from selling such motor fuels or products, provided that if the marketing agreement permits the retail dealer to use the distributor's trademark, the marketing agreement may require such motor fuels, petroleum products, and automotive products to be of a reasonably similar quality to those of the distributor, and provided further that the retail dealer shall neither represent such motor fuels or

---

(…continued)

EEOC's own statutory enforcement authority.  We thus agree with the EEOC that the agency suffers an 'injury' sufficient to give rise to Article III standing when a violation of Section 102 of the ADA occurs." (citations omitted)).

products as having been procured from the distributor nor sell such motor fuels or products under the distributor's trademark; [or] . . .

(11) Contain any term or condition which, directly or indirectly, violates this subchapter.

Looking to the text of § 36-303.01, and examining it in the context of the RSSA as a whole and its legislative history, I discern no sovereign interests; I see only private, proprietary interests, which are insufficient to provide the District with standing to sue in this case. *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) ("[A] State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens.").

Section 36-303.01 by its terms imposes limitations on "marketing agreements," which are defined in pertinent part as "any written agreement, or combination of agreements, including any contract, lease, franchise, or other agreement, *which is entered into between a distributor and a retail dealer* and pursuant to which" the parties contract for the sale of motor fuel. D.C. Code § 36-301.01 (2013 Repl.) (emphasis added). Distributors and retail dealers are in turn

defined as private "persons."[27]  Moreover, if a distributor violates the provisions of § 36-303.01, only retail dealers have a right of action to seek relief under Subchapter III.[28]  *See* D.C. Code § 36-303.04 (2001) (listing the remedies retail dealers may seek against distributors in specific scenarios "in addition to any and all other remedies available"); D.C. Code § 36-303.06 (2001) (specifying the types of civil actions retail dealers may bring against distributors in addition to the remedies available under § 36-303.04 and other statutes or laws).  Just as important as what the statute says is what it does not:  nowhere in Subchapter III is the District mentioned, either as an interested party or an enforcer, nor is there any

---

[27] *See* D.C. Code § 36-301.01 (2) (defining a "[d]istributor" in pertinent part as "any person who is engaged in the business of selling, supplying, or distributing on consignment or otherwise, motor fuels or petroleum products to or through retail service stations."); D.C. Code § 36-301.01 (13) (defining a "[r]etail dealer" in pertinent part as "any person, other than an employee of a distributor, who owns, leases, operates, or otherwise controls a retail service station for the purpose of engaging in the retail sale of motor fuel"); D.C. Code § 36-301.01 (10) (defining a "person" in pertinent part as "any natural person, firm, association, business trust, trust, estate, partnership, corporation, 2 or more persons having a common or joint interest, or other legal or commercial entity").

[28] The fact that the legislature appears not to have given the government an express or implied cause of action, *see infra* Part II, also indicates that its objective was only to protect private interests.  *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("Although standing in no way depends on the merits of the plaintiff's contention that [the defendant's conduct violates a statute], it often turns on the nature and source of the claim asserted.  The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." (cleaned up)).

indication that regulating the terms of these contracts is in the broader public interest.

By contrast, Subchapters II and IV of the RSSA *expressly* call for the executive branch of the District to promulgate a regulatory scheme governing the operation and conversion of retail service stations, *see* D.C. Code § 36-302.04 (c) (2001) (directing the Mayor to "promulgate all other rules and regulations necessary for the proper implementation and enforcement of subchapters II and IV"), and authorize the District to enforce those statutory provisions and attendant regulations, *see* D.C. Code § 36-302.05 (a) (2013 Repl.) (authorizing the Mayor to order individuals believed to be violating these provisions to cease and desist and if they do not comply to seek injunctive relief); § 36-302.05 (b) (designating "[a]ny violation of any provision of subchapter II or IV of this chapter or the rules and regulations promulgated pursuant thereto" as "a misdemeanor"). Unlike Subchapter III, Subchapters II and IV clearly define sovereign interests enforceable by the sovereign through administrative oversight, affirmative civil litigation, or criminal prosecution.

The legislative history of the RSSA likewise reflects that Subchapter III was expressly designed by the Council to regulate private conduct, whereas

Subchapters II and IV were designed for government enforcement. In the RSSA Committee Report, the Council explained that, in response to its various concerns regarding the distribution and sale of motor fuel in the District, it had drafted a statute with "three Titles, each involving a *different form* of regulation," and each with the purpose of protecting different interests. D.C. Council, Comm. on Transp. & Envtl. Affairs, Report on Bill Nos. 1-333 & 1-39 at 20 (Nov. 16, 1976) ("RSSA Committee Report") (emphasis added). The section of the Report addressing Subchapter III of the RSSA begins by explaining that its "primary purpose . . .is to afford independent motor fuel dealers operating under marketing agreements increased legal protection against arbitrary, unreasonable, and discriminatory terminations, cancellations, and non-renewals of their marketing agreements by distributors," *id.* at 25, through "preempt[ion]" of traditional contract law, *id.* at 26. The Report then explains that existing laws "afford inadequate protection to retail dealers" and expresses concern that because of the "significant disparity in bargaining power" between retailers and distributors when executing marketing agreements, "distributors are able to dictate the terms of a marketing agreement"— a form of contract—"to their own best advantage while taking unfair advantage of the prospective retail dealer." *Id.* The Report expressed particular concern about contract terms that permitted distributors to "reserve a unilateral contract right to terminate, cancel[], not renew, or modify a marketing agreement on short notice."

*Id.* "As a result, retail dealers are generally denied the traditional prerogatives and protections afforded to independent businessmen." *Id.* Following this explanation of its impetus, the Report enumerates the five "purposes" Subchapter III will "serve":

> (1) to grant increased legal protection to retail dealers . . . ; (2) to clarify the contractual relationship between distributors and retail dealers . . . ; (3) to insure that distributors will treat retail dealers in an equitable manner; (4) to end . . . the arbitrary, unreasonable, and discriminatory terminations, cancellations, and nonrenewals of marketing agreements and other abuses of retail dealers and unsavory practices by distributors; and (5) to enhance the independence of retail dealers in the operation of their retail services stations . . . and, thereby, enhance fair and honest competition and the ability of retail dealers to tailor their operations to the needs, preferences, and convenience of their local customers.

*Id.* at 28. The Report then explains how the RSSA will "achieve these purposes," including by prohibiting certain types of contractual provisions and "granting the retail dealer a legal cause of action for the distributor's violation" of Subchapter III. *Id.* at 28–29.[29]

---

[29] The majority opinion ignores much of this discussion of the rationale for Subchapter III and instead quotes disparate snippets of the Report to support its argument that Subchapter III was drafted with the aim of protecting the general public. *Ante* p. 48–50. Read in context these select quotations do not support the majority opinion's argument. And even if these quotations did show that the Council thought that a byproduct of Subchapter III would be some benefit to

(continued…)

By contrast, the Report states that the "primary purpose" of Subchapters II and IV are, respectively and much more broadly, "to preserve and, to some extent, enhance competition in the retail marketing segment of the petroleum industry" through marketplace regulation, *id.* at 22; *see also id.* at 22–23 (discussing the four goals that "will be achieved" by Subchapter II and referencing increased competition and lower fuel prices), and to protect all "consumers" by "temporarily" limiting closures of full service retail service stations "pending a study of the existing facilities" by the Mayor, *id.* at 33–34.

That the Council intended to protect different interests with different enforcement mechanisms in the subchapters of the RSSA is also reflected in the Report's discussion of the "fiscal impact" of the legislation. The Council stated that Subchapter III of the RSSA "deals exclusively with private rights and, therefore, should have negligible budgetary impacts on the District of Columbia." RSSA Committee Report at 64. But the Council acknowledged that Subchapters II and IV would "impose . . . additional duties and responsibilities on the District of

---

(…continued)

District consumers generally, that does not establish the government's sovereign interest and a standing to sue under Subchapter III of the RSSA. In our modern era, the government does not have freeform *parens patriae* standing to sue to enforce any statute it chooses. *See supra* note 13.

Columbia Government," including "enforcement of violations" of the provisions in these subchapters. *Id.* at 63.

In sum, the plain text, the structure, and the legislative history of the RSSA demonstrate that the Council clearly and explicitly assigned separate roles for public and private enforcement of the RSSA. As the RSSA Committee Report explains, Subchapter III "deals exclusively with private rights" and interests, not sovereign ones. *Id.* at 64. Therefore, even if it were permissible for this court to seek out a novel theory of standing not urged by the District, I could not agree the District can claim injury to a sovereign interest and thus standing to sue under Subchapter III of the RSSA.

## II. Cause of Action: The 12 (b)(6) Ruling

As noted above, standing is jurisdictional. If the District lacks standing to sue under the Subchapter III of the RSSA, there is no need to review the trial court's additional ruling dismissing the District's complaint for failure to state a claim, i.e., for failure to identify a cause of action in the statute, Super. Ct. Civ. R. 12 (b)(6). But the majority opinion, having supplied the District with a theory of standing, reaches the trial court's 12 (b)(6) ruling and concludes that the trial court erred when it determined that the District possesses neither an express nor an

implied cause of action under Subchapter III of the RSSA. The majority opinion eschews any analysis of an express or implied cause of action under Subchapter III of the RSSA, instead asserting that the District's designated agent, its Attorney General, derives its right to sue under the 2010 Attorney General Act, specifically, D.C. Code § 1-301.81 (a)(1). According to the majority opinion, § 1-301.81 (a)(1) gave the District's Attorney General a cause of action to sue in the public interest that is unbounded unless the particular statute under which the Attorney General seeks to sue expressly prohibits the Attorney General from suing thereunder. Just as with its standing analysis, the majority opinion confers on the District broad rights that are unfounded in the law, that exempt the government from established rules of litigation, and that raise separation of powers concerns. Once again, I cannot agree with the majority opinion's analysis.

A plaintiff may have a cognizable interest in a matter such that she has standing to sue, but nonetheless be without a cause of action to pursue her claims in court.[30] To determine if a litigant suing under a statute has an express or implied cause of action, courts look to the statute under which the suit has been filed:

---

[30] *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 (1979) ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."); *Jones v. District of Columbia*, 996 A.2d 834, 841 (D.C. 2010) (same); *see also Lexmark Int'l, Inc. v.*

(continued…)

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (cleaned up); *accord Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("The question of the existence of a statutory cause of action is, of course, one of statutory construction."); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84, 286 (2002). This court conducts the same statutory analysis to determine if the District government has a cause of action. *See Beretta*, 872 A.2d at 651–52 (holding that the Assault Weapon Manufacturing Strict Liability Act of 1990, D.C. Code § 7-2551.01 *et seq.* (2001), "confers a right of action on individuals who are injured, but not the District of Columbia," looking to the text as "the primary source for determining its drafters' intent").

---

(…continued)

*Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 n.4 (2014) (explaining that "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case" (cleaned up)).

The District has conceded in its brief to this court, as it must, that Subchapter III of the RSSA, unlike other subchapters, "does not provide the District . . . with express authority to enforce § 36-303.01 (a)." And, by failing to make the argument, it implicitly concedes—again, correctly in my view—that the RSSA does not provide it with an implied cause of action either. There is no indication in the text, structure, or legislative history of the RSSA that the Council intended to give the District government a right to sue to enforce the private, proprietary interests protected by Subchapter III. *See supra* Part I.B.2. Instead, whereas the RSSA gives the Mayor enforcement powers under Subchapters II and IV, it does not give the Mayor (or any executive branch official)[31] those powers under Subchapter III of the RSSA. *See supra* Part I.B.2. Finally, the Council's recent, repeated failures to pass bills attempting to give the Attorney General the enforcement power it lacks under Subchapter III indicates that the Council does not want to give the Attorney General this authority to sue.[32] The Council has, at

---

[31] At the time RSSA became law in 1977, *see* Retail Station Service Dealer Act, D.C. Law 1-123 (1977), the District had a unitary executive, the Mayor, who had the power to appoint a "Corporation Counsel." *See ante* note 24. In 2004, the Mayor changed the title of the Corporation Counsel to "Attorney General," *id.*, and in 2014 the Attorney General became an elected, rather than appointed, official.

[32] In 2011—after the 2010 Attorney General Act became law—the Attorney General asked the Council to add language to Subchapter III of the RSSA "providing the Attorney General with express authority to seek injunctions and civil penalties, on behalf of the public, against distributors that violate the

(continued…)

least for the time being, spoken; the Attorney General's recourse to obtain authority to sue is to the Council, not this court. *See Sandoval*, 532 U.S. at 286–87.

Even so, the District argues that it has a right to sue because, "[i]n the absence of any express statutory enforcement mechanism, the District may act pursuant to its *parens patriae* authority to seek injunctive relieve against violations of" Subchapter III of the RSSA, "so long as it can satisfy the *Snapp* requirements for *parens patriae* standing." This inapposite and legally incorrect standing argument is the only argument the District made to this court in support of its authority to sue, and the majority opinion ignores it.

---

(…continued)
District's gasoline marketing agreement law." D.C. Council, Comm. Gov't Ops. & Env't, Report on Bill 19-299 at 46 (July 11, 2011) ("2011 RSSA Report") (letter from the Office of the Attorney General to Councilmember Mary Cheh). The purpose of the bill was, inter alia, to "empower the Attorney General of the District to bring legal actions . . . for violations" of the RSSA. *Id.* at 2. The bill failed in 2012.

More recently, in 2014, the Council considered but failed to act upon a bill to give the Attorney General the power to sue for an injunction under D.C. Code § 36-303.01. *See* D.C. Council, Retail Service Station and Neighborhood Services Protection Amendment Act of 2014, § 2 (d) (Sept. 22, 2014). The Council has not taken any action on this proposed bill since it was introduced nearly three years ago.

Instead, the majority independently concludes that the District has authority to sue under the 2010 Attorney General Act, which defines the "duties" of the Attorney General and provides that this executive officer

> shall have charge and conduct of all law business of the said District and all suits instituted by and against the government thereof, and shall possess all powers afforded the Attorney General by the common and statutory law of the District and shall be responsible for upholding the public interest. The Attorney General shall have the power to control litigation and appeals, as well as the power to intervene in legal proceedings on behalf of this public interest.

D.C. Code § 1-301.81 (a)(1). The majority opinion reasons (1) that the 2010 Attorney General Act removed the still-mayorally-appointed Attorney General from under the "direction of the mayor" and gave the Attorney General broad, "common law" powers to sue in the public interest, which he was previously unable to exercise, *ante* pp. 31–34; (2) that these powers are unfettered unless expressly limited by statute, *see ante* pp. 34–35; and (3) therefore, the limits in the RSSA that clearly indicate that the *Mayor* has no enforcement authority under Subchapter III of the RSSA, *see supra* Part I.B.2, do not limit the authority of the

Attorney General in this suit, *see ante* Part III.B.2. The majority opinion's analysis is brand new to this case;[33] it is also ahistorical and atextual.

First, we must return to the time of the Adrian Fenty administration, when a number of councilmembers were displeased with the mayorally-appointed Attorney General, Peter Nickles; they felt he was abrogating his duty to act as the District's lawyer and was too focused on serving the political interests of the Mayor.[34] The Council developed an interest in making the Attorney General an elected position, independent from the Mayor, but it did not have the authority to

[33] The majority quotes from a trial court pleading to suggest that the District has relied on D.C. Code § 1-301.81 to supply a cause of action all along. *Ante* p. 36. But the District cited this statute to the trial court only once, in the context of making the same argument it made before this court—that it automatically had a cause of action by virtue of its standing to sue under *Snapp*. Even if the District preserved an argument that it had a cause of action under the 2010 Attorney General Act, it waived it in this court. The District's initial and reply briefs do not contain a single citation to D.C. Code § 1-301.81. Nor do they contain any argument that the 2010 Attorney General Act was the source of the District's authority to sue.

[34] *See* D.C. Appleseed Center, Memorandum to Councilmember Phil Mendelson at 2 (Sept. 5, 2008) (attached to committee report for the 2010 Attorney General Act, D.C. Council, Comm. on Pub. Safety & Judiciary, Report on Bill No. 18-65 (Dec. 16, 2009) ("2009 Committee Report")); *see also, e.g.*, D.C. Council, Comm. on Pub. Safety & Judiciary, Report on Proposed Resolution 17-928 at 5 (Nov. 17, 2008) (expressing concern over the lack of independence of the Attorney General and urging the Council to disapprove of Mayor Fenty's nomination of Mr. Nickles for Attorney General, because Mr. Nickles "assert[ed] that the Attorney General does not possess any independence from the Executive Office of the Mayor").

unilaterally amend the District Charter to make this change. *See Zukerberg v. District of Columbia Bd. of Elections & Ethics*, 97 A.3d 1064, 1070 (D.C. 2014). Steps were taken to amend the District Charter, via Congressional action or public referendum, and, in the meantime, the Council passed the 2010 Attorney General for the District of Columbia Clarification and Elected Term Amendment Act.

As its full title indicates, the Council sought to "*clarify*" that the Attorney General was independent of the mayor and legally obligated to act in the public interest and—planning ahead for the day when the Attorney General was a fully independent, separately elected office—to address how those elections would be conducted. The object of this legislation was not to boost the power of an office the Council thought was too weak, but to redirect in furtherance of the public interest power that the Council understood the Attorney General already to possess. This is evident in both the text and legislative history of the Act.

The first section of the Act, § 101, defines the "duties" of the Attorney General and was modeled on the Corporation Counsel statute, *see ante* note 24 (quoting the text of the Corporation Counsel statute, D.C. Code § 1-301.111 (2009)). Section 101 (a)(1) omits the introductory language from the Corporation Counsel statute that the Corporation Counsel "shall be at the direction of the

Mayor," and begins with the directive that appears in the second sentence of the Corporation Counsel statute, that the Attorney General "shall have charge and conduct all law business of the said District and all suits instituted by and against the government thereof." *Compare* D.C. Code § 1-301.111, *with* § 1-301.81 (a)(1). The Act then adds that the Attorney General "possess all powers afforded . . . by the common and statutory law of the District" and has the concomitant "responsib[ility] to uphold[] the public interest." The remainder of § 101 reverts to the language of the former Corporation Counsel statute, directing the Attorney General to "furnish opinions in writing to the Mayor," as well as the Council, "whenever requested to do so"; it also imposes a parallel duty to respond to similar requests from the Council and places the burden on the Attorney General to keep a record of these requests and responses.

The thrust of this text, as amended, is that the Attorney General is an independent decision-maker whose powers originate not from the Mayor but from common law and statute. But the amended language gives no indication that the Attorney General's powers are greater than they were under the Corporation Counsel statute. In particular, they give no indication the Attorney General has increased powers to sue to enforce any and all provisions of the D.C. Code in furtherance of the public interest, whether or not the statute in question conferred

an express or implied cause of action. Nor does any other provision of the Act give the Attorney General, in his "clarified" role as an independent lawyer for the District, such increased authority to sue. *See, e.g.*, 2010 Attorney General Act at § 102 (governing the appointment of the Attorney General by the Mayor, "[u]ntil such time as an Attorney General is elected"); *id.* at § 103 (governing the minimum qualifications and requirements for the Attorney General); *id.* at § 104 (governing forfeiture the position of Attorney General);[35] *id.* at § 105 (governing the Attorney General salary).

The majority opinion looks beyond the text of the 2010 Attorney General Act to its legislative history to support its argument that the Council gave the Attorney General increased powers to sue in the public interest, *ante* pp. 34–36, but to no avail. The legislative history underscores that the intent of the 2010 Attorney General Act was to "clarify" that the Attorney General, however selected, was institutionally independent from the Mayor and had a *pre-existing* obligation to act in the public interest. The Committee Report expressly states that:

---

[35] To the extent the Act sought to "strengthen the position" of the Attorney General, it was through effectuating provisions mandating certain qualifications for the office holder, setting a term of office, and requiring the appointment of a special counsel when conflicts arose, in order to "provide greater strength and credibility to the position." D.C. Council, Comm. on Pub. Safety & Judiciary, Report on Bill No. 18-65 at 8–9 (Dec. 16, 2009).

> [T]he Attorney General for the District of Columbia Clarification and Elected Term Amendment Act of 2009, *makes clear in the law what is axiomatic*: that the responsibility of the Attorney General is to serve the citizens of the District. The legislation *codifies* the institutional independence and makes modifications to strengthen the position of Attorney General through the establishment of minimum qualifications and a term of service.

D.C. Council, Comm. on Pub. Safety & Judiciary, Report on Bill No. 18-65 at 1–2 (Dec. 16, 2009) ("2009 Committee Report") (emphases added); *id.* at 5 ("[T]he District's Attorney General *maintains* common law powers, including the position's duty to the public." (emphasis added)); *id.* (explaining that these common law powers were derived from Maryland common law, that they could be abrogated by statute, but that "[a] careful review of the District's Charter, and relevant statutory provisions pertaining to the Attorney General's authority, clearly reveal that *no such deprivation has been achieved or attempted*," but instead that "the responsibilities of the Attorney General have *consistently* aimed toward the execution of the District's law business in furtherance of the public interest" (emphasis added)).[36]

---

[36] If further evidence is needed that the Council did not believe the 2010 Attorney General Act gave new powers to the Attorney General, the architect of the 2010 Attorney General Act and its chief proponent, Council Chairman Mendelson, *see* 2009 Committee Report at 11, was the sponsor of the failed

(continued…)

The legislative history not only gives no indication that any change in the Attorney General's powers was contemplated—either generally or with respect to his power to sue—but also expressly states that the *only* "major substantive change to the Attorney General position under [the Act] is in the selection process." 2009 Committee Report at 2. The 2009 Committee Report explained that "[w]hile the Attorney General has a *long established obligation to represent and defend the legal interests of the public*, it is not the public but the Executive that appoints the individual to this position." *Id.* (emphasis added). The Act "would remedy this inequity by allowing for the direct election of the Attorney General" and "*making clear in the law* that he or she is the lawyer *for* the District of Columbia and is thus to act as the public interest requires." *Id.* (first emphasis added). But the report noted that the Act "will not prevent the current Attorney General from *continuing to serve* in that role."[37] *Id.* (emphasis added).

---

(…continued)

attempt in 2014 to give the District authority to sue under Subchapter III of the RSSA, *see supra* note 32. It is difficult to reconcile this fact with the majority opinion's argument the Council may have refused to pass the 2014 amendment because it thought the attorney general had, under the 2010 Attorney General Act, all the power he needed to sue to enforce any statute in the public interest. *Ante* p. 46–48.

[37] Furthermore, in a 2011 report, the Council comprehensively listed the "legal responsibilities" of the Attorney General, which in sum and substance

(continued…)

The majority opinion, however, seems to think that the reference in § 1-301.81 (a)(1) to "common law" powers to "uphold[] the public interest" gives the Attorney General new authority to bring lawsuits in the public interest, even without an express or implied right of action under the statute under which the Attorney General seeks relief. *Ante* pp. 33–35. Again, there is no indication in the text or the legislative history of the 2010 Attorney General Act that this was the Council's intent.[38] But more fundamentally, the majority opinion never specifies what new "common law" powers it thinks were given—or restored—to the Attorney General by operation of the 2010 Attorney General Act. The majority does not identify the substance or scope of these common law powers, or explain

---

(…continued)
mirrored the Council's understanding of the powers attributed to the Attorney General prior to the passage of the 2010 Attorney General Act. *Compare* D.C. Council, Comm. on Judiciary, Report on Proposed Resolution 19-42 at 5–6 (May 2, 2011), *with* D.C. Council, Comm. on Judiciary, Report on Proposed Resolution 17-60 at 1–2 (Apr. 2, 2007).

[38] In support of the proposition that D.C. Code § 1-301.81 (a)(1) should be read broadly to give the District's Attorney General a cause of action in this case, the majority opinion cites the First Circuit's decision in *Shell Oil*, 608 F.3d 208, discussing the Rhode Island Attorney General's authority to sue under that state's Motor Fuel Distribution and Sales Act. As noted above, *see supra* note 22, the First Circuit held that it was *unclear under that state's law* whether the Attorney General had the power to enforce a provision that did not give the State an express cause of action. *Shell Oil* does not support the majority opinion's argument; it undercuts it.

why they authorize the Attorney General to sue even without an express or implied cause of action under a particular statute. It is not enough for the majority opinion to cite cases discussing the common law powers of Attorneys General from other states,[39] or to allude generally to "the common law." There is no uniform, "common law" understanding of a state Attorney General's powers.[40] If, as the majority opinion suggests, § 1-301.81 (a)(1) sought to confer enhanced powers on the Attorney General derived from "common law," we must, per the statute, examine what those powers were under "the common . . . law of the District."

---

[39] *See ante* p. 34 (observing that the Attorney General "typically *may exercise all such authority as the public interest requires*" (quoting *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 268–69 (5th Cir. 1976), which addressed "the right of the Attorney General, under *Florida law*, to initiate th[e] action" (emphasis added))); *see also ante* note 28 (citing cases discussing the powers of the Attorneys General in Alaska, Kentucky, New Mexico, Massachusetts, and Michigan).

[40] *See* National Assoc. of Attorneys General, *Common Law Powers of State Attorneys General* 1 (1977) ("The common law is different in each state, as it depends on definition by that state's courts . . . ."); *id.* at 15 (noting the "astonishing array of mutations [of the powers of a state attorney general] which make it altogether impossible to reach any sweeping generalization on the matter"); Neal Devins & Saikrishna Bangalore Prakash, *Fifty States, Fifty Attorneys General, and Fifty Approaches to the Duty to Defend*, 124 Yale L.J. 2100, 2120, 2123 (2015) ("[T]he state office [of attorney general] has rather different contours across the fifty states. . . . Though there are some commonalities, the office of the attorney general is not the same across the fifty states. . . ."); National Assoc. of Attorneys General, *State Attorneys General* 31 (2013) ("American courts have not formulated an accepted delineation of common law powers of the attorney general in this country.").

As the legislative history of the 2010 Attorney General Act reflects, the District looks to Maryland common law "in force on February 27, 1801." D.C. Code § 45-401 (2013 Repl.) (explaining that the District's common law is derived from Maryland). But the majority does not cite to Maryland case law or treatises from 1801 (or prior) to establish the scope of the Maryland Attorney General's powers to sue at that time.[41] Even so, it would be curious to discern that, by operation of the 2010 Attorney General Act, Maryland common law from 1801 gave the District's Attorney General power to sue in the public interest: even allowing for state-by-state differences, the role of a state Attorney General as it

---

[41] The majority cites *State v. Burning Tree Club, Inc.*, 481 A.2d 785 (Md. 1984), as one of several cases showing that "case law from numerous other jurisdictions likewise recognizes 'a broad grant of authority [to the Attorney General,] which includes the power to act to enforce [the state's] statutes.'" *Ante* note 28. That case addressed the Maryland Attorney General's standing to challenge the constitutionality of a statute and did not affirm the Attorney General's authority to sue to enforce any state statute without an express or implied cause of action. (The court held that the Maryland Attorney General did not have "inherent powers" sufficient to give him standing. *Id.* at 789.) In any event, the Maryland decision does not reflect the common law from 1801; instead, it acknowledges that the Attorney General "has only such powers as are vested in him by the Constitution of Maryland and the various enactments" of the Maryland legislature. *Id.* at 797; *see also* D.C. Appleseed Center, Memorandum to Councilmember Phil Mendelson at 5 (Sept. 5, 2008) (acknowledging that the "common law powers [of the Maryland Attorney General] . . . have since been specifically modified . . . through acts of the state's General Assembly"); *see also generally Murphy v. Yates*, 348 A.2d 837 (Md. 1975); Edward C. Papenfuse, et al., Maryland State Archives, 1 *Archives of Maryland, Historical List, Attorneys General (1777–)* 1990, http://msa.maryland.gov/msa/speccol/sc2600/sc2685/html/attygen.html.

was understood two hundred years ago was to be "the appointed servant of the Sovereign and guardian of the Crown's interest"; the conception of the Attorney General as defender of the public interest is a construct of the Twentieth Century. National Assoc. of Attorneys General, *State Attorneys General* 31 (2013).

For these reasons, I disagree that the 2010 Attorney General Act fundamentally altered the authority of the District's Attorney General and gave him broad authority to sue in the public interest to enforce any statute unless expressly prohibited from doing so. Thus, I think the majority has the analysis backwards when it states that the inquiry is whether the Council has "affirmatively *precluded*" the Attorney General from suing under the RSSA, *ante* p. 40. Instead, as explained above, the trial court was correct to look to Subchapter III of the RSSA to see if the Council had given the District (represented by the Attorney General) an express or implied right of action thereunder, and was correct to determine that the Council had not. [42]

---

[42] The majority asserts that it is not an "unwarranted leap" to permit the Attorney General to enforce Subchapter III of the RSSA because this court has already found an implied right of action for other private actors—franchisees—to sue to enforce the marketing-agreement restrictions of § 36-303.01(a). *Ante* pp. 43–44. But based on a textual analysis of Subchapter III it makes sense to recognize that these private actors may sue. *See supra* Part I.B.2; *see also Davis v. Gulf Oil Corp.*, 485 A.2d 160, 171 n.12 (D.C. 1984) (expressing "certain[ty]" that the legislature intended to allow franchisees to sue under this specific provision).

(continued…)

### III.    Conclusion

With its decision in this case, the majority opinion relieves the District government of burdens all other plaintiffs must shoulder if they wish to seek judicial relief—burdens to show standing and a right to sue under a particular statute.  As detailed above, I disagree with the particulars of the majority opinion's legal analysis.  But more fundamentally, I question whether the judicial branch should provide such assistance to the executive branch to pursue a lawsuit, particularly when the effect is to countermand the legislature's decision as to who may enforce the law in question.  I respectfully dissent.

---

(…continued)
The same logic does not pertain to the majority opinion's reliance on a different statute, D.C. Code § 1-301.81 (a)(1), to give the District government the authority to sue to enforce the provisions of Subchapter III of the RSSA.